UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                             :
UNITED STATES OF AMERICA                                     :
                                                             :          16 Cr. 331 (WHP)
            - v. -                                           :
                                                             :
TONY PRITCHETTE,                                             :
                                                             :
                    Defendant.                               :
                                                             :
------------------------------------------------------------- X


### THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS THE DEFENDANT'S POST-ARREST STATEMENTS


                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York
                                One St. Andrew's Plaza
                                New York, New York 10007


Catherine E. Geddes
Assistant United States Attorney
        *Of Counsel*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

RELEVANT FACTS .................................................................................................................... 1

    A.   Background ....................................................................................................... 1

    B.   April 1, 2016 Post-Arrest Statement to NYPD ................................................ 2

    C.   May 2, 2016 Post-Arrest Statement to Federal Authorities ............................. 5

ARGUMENT ................................................................................................................................ 8

    I.   There Was No Impermissible Two-Step Process ............................................ 8

    A.   Applicable Law ................................................................................................ 8

    B.   Discussion ...................................................................................................... 10

        1. April Interview. ........................................................................................ 10

        2. May Interview. .......................................................................................... 10

    II.   The Defendant's Statements Were Voluntary ............................................... 12

    A.   Applicable Law .............................................................................................. 12

    B.   Discussion ...................................................................................................... 14

        1. The April Interview Was Voluntary ......................................................... 14

        2. The May Interview Was Also Voluntary .................................................. 18

CONCLUSION ........................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

*Alvarez* v. *Keane*, 92 F. Supp. 2d 137 (E.D.N.Y. 2000) ......................................................... 13

*Avincola v. Stinson*, 60 F. Supp. 2d 133 (S.D.N.Y. 1999) .................................................. 13, 18

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ............................................................................ 13

*Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989) ............................................................... 13

*Colorado v. Connelly*, 479 U.S. 157 (1986) ............................................................................. 8

*Green* v. *Scully*, 850 F.2d 894 (2d Cir. 1987) ....................................................................... 12

*Illinois v. Perkins*, 496 U.S. 292 (1990) ................................................................................ 21

*Lynumn v. Illinois*, 372 U.S. 528 (1963) ................................................................................ 12

*Miranda v. Arizona*, 384 U.S. 436 (1966) .............................................................................. 12

*Missouri v. Seibert*, 542 U.S. 600 (2004) ................................................................................ 9

*Moran v. Burbine*, 475 U.S. 412 (1986) .................................................................................. 8

*Oregon v. Elstad*, 470 U.S. 298 (1985) ............................................................................... 9, 12

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ................................................................. 13

*Toste v. Lopes*, 701 F.Supp. 306 (D. Conn. 1987) ................................................................. 18

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) .................................................. passim

*United States v. Brooks*, 125 F.3d 484 (7th Cir. 1997) .......................................................... 15

*United States v. Chan*, 2006 WL 3155695 (S.D.N.Y. Oct. 31, 2006) ..................................... 20

*United States v. Chavez*, 2015 WL 1650838 (D. Conn. Apr. 14, 2015) ................................... 14

*United States v. DiLorenzo*, 1995 WL 366377 (S.D.N.Y. June 19, 1995) .......................... 13, 15

*United States v. Egipciaco*, 389 F. Supp. 2d 520 (S.D.N.Y. 2005) ......................................... 21

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) .................................................. 17

*United States v. Garcia Abrego*, 141 F.3d 142 (5th Cir. 1998) .............................................. 15

*United States v. Grant*, 427 F. Supp. 45 (S.D.N.Y. 1976) ...................................................... 15

*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995) ............................................................... 8

*United States v. Medina*, 19 F. Supp. 3d 518 (S.D.N.Y. 2014) .............................................. 15

*United States v. Meregildo*, 2012 WL 4378047 (S.D.N.Y. Sept. 24, 2012) .............................. 8

*United States v. Montana*, 958 F.2d 516 (2d Cir. 1992) ......................................................... 11

*United States v. Moore*, 670 F.3d 222 (2d Cir. 2012) ........................................................ 11, 12

*United States v. Palmer*, 203 F.3d 55 (1st Cir. 2000) ............................................................ 17

*United States v. Pomares*, 499 F.2d 1220 (2d Cir. 1974) ....................................................... 19

*United States v. Rijo-Carrion*, 2012 WL 6617388 (E.D.N.Y. Dec. 19, 2012) ............................ 18

*United States v. Ruggles*, 70 F.3d 262 (2d Cir. 1995) ................................................................. 19

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)................................................................. 16

*United States v. Santiago*, 174 F. Supp. 2d 16 (S.D.N.Y. 2001) ................................................. 13

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) .................................................................. 18

*United States v. Shehadeh*, 586 F. App'x 47 (2d Cir. 2014)........................................................ 14

*United States v. Simmonds*, 641 F. App'x 99 (2d Cir. 2016)........................................................ 17

*United States v. Spencer*, 995 F.2d 10 (2d Cir. 1993) ................................................................. 13

*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014).......................................................... 9, 16, 17

*United States v. Troche*, 181 F. Supp. 2d 340 (S.D.N.Y. 2002) .................................................. 11

*United States v. Turner*, 157 F.3d 552 (8th Cir. 1998) ............................................................... 13

*United States v. Williams*, 681 F.3d 35 (2d Cir. 2012) ................................................................. 9

*United States v. Wyche*, 307 F. Supp. 2d 453 (E.D.N.Y. 2004) .................................................. 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion to suppress of Tony Pritchette ("Pritchette" or "the defendant"), dated August 26, 2016 ("Def. Br."). The defendant is charged in the sole count of Indictment 16 Cr. 331 (WHP) with Hobbs Act Robbery. The defendant moves to suppress two separate and inculpatory statements made to law enforcement because he claims that: (1) the statements were elicited in violation of *Miranda* because law enforcement employed an impermissible two-step interrogation process; (2) the defendant's drug use rendered the first statement involuntary; and (3) the second statement was coerced. Because the defendant's sworn declaration creates a disputed issue of fact, the Government consents to a hearing with respect to the defendant's allegation that the first statement was elicited in violation of *Miranda*. The videotaped confessions, however, clearly demonstrate that the defendant's statements were voluntary and therefore the Government submits that the remainder of the defendant's motion should be denied without a hearing.

## RELEVANT FACTS

### A.    Background

On or about March 14, 2016, New York City Police Department ("NYPD") officers responded to a 9-1-1 call reporting a robbery at a cell phone store in the Bronx, New York. (Complaint ¶ 3.) According to the store clerk and based upon surveillance video, at approximately 4:00 p.m. a male – later identified as the defendant – entered the cell phone store with a shopping cart. (*Id.*) The defendant brandished what appeared to be a long firearm and took the store clerk, who was the only person in the store at the time, by her hair into a back office, where he took several new cell phones. (*Id.*) Upon returning to the front of the store, the defendant took the store clerk's cell phone and United States currency from the cash drawer.

1

(*Id.*)  He left behind the cart and gun, which turned out to be an air rifle wrapped in plastic.  (*Id.*)

The police obtained video surveillance from both the cell phone store and a nearby bodega and distributed images of the robber to the media.  (Complaint ¶ 6.)  On or about April 1, 2016, at approximately 5:00 p.m., a man called 9-1-1 to report that he was following someone he believed to be the robbery suspect.  (Complaint ¶ 7.)  The caller said he recognized the suspect from a homeless shelter.  (*Id.*)  NYPD officers responded and arrested the defendant, whom the caller had identified as the robber.

Pritchette was taken into NYPD custody and then incarcerated in Rikers Island on a parole violation.  Approximately one month later, on May 2, he was brought into federal custody pursuant to an arrest warrant issued in connection with a criminal Complaint that charged Pritchette with one count of Hobbs Act Robbery, in violation of Title 18, United States Code, Sections 1951 and 2, for the robbery described above.  On May 10, 2016, Pritchette was indicted by a Grand Jury sitting in this district.

### B.      April 1, 2016 Post-Arrest Statement to NYPD

On April 1, 2016, while in NYPD custody, following advisement of his *Miranda* rights, Pritchette made incriminating statements in which he confessed to the robbery and provided specific details of the crime (the "April Interview").  The administration of *Miranda* and the defendant's subsequent statements were videotaped.

As can be seen on the video that recorded that interview (Def. Ex. D),[1] Pritchette enters the room at approximately 18:28:13 (approximately one minute into the recording), and opens a bottle of water.  He asks if he is going to be read his rights (18:28:32), and the questioning sergeant ("Sergeant-1") says "yeah, hang on one second," and then leaves the room to retrieve a

---

[1] Citations in this Section B are to the timestamps in the Defendant Exhibit D video.

lighter.  While left in the room with an NYPD detective ("Detective-1"), Pritchette spontaneously states "man, I'm going to jail."  (18:28:43.)  After Sergeant-1 returns and lights a cigarette for Pritchette, Detective-1 begins to introduce himself and read *Miranda* warnings from a card; Pritchette interrupts to say "I know my rights."  (18:29:06.)  Sergeant-1 interrupts to ask "some basic questions" before they begin, including how to pronounce Pritchette's last name; Sergeant-1 asks whether the name is Italian, and the defendant explains his family heritage.

Sergeant-1 then explains that "there's an incident obviously we want to speak to you about.  You're entitled to your rights.  We're gonna read them to you, and then we're gonna talk. Ok?  You understand?  If you don't understand . . . ."  (18:29:35.)  Pritchette responds that he understands; "I probably know it by heart."  (18:29:50.)  Detective-1 says that they still need to read Pritchette his rights, and that if Pritchette does not understand any he can let them know and they will explain.  Detective-1 then goes through each right.  (18:30:04)  After each, Pritchette states that he understands that: (1) he has the right to remain silent and refuse to answer questions; (2) anything he says may be used against him in a court of law; (3) he has the right to consult an attorney before speaking to the police, and to have an attorney present during any questioning now or in the future; (4) if he cannot afford an attorney, one will be provided for him without cost; and (5) if he does not have an attorney available, he has the right to remain silent until he has had an opportunity to consult with one.  After being advised of these rights, Pritchette is asked if he is willing to answer questions; he says yes.  (18:30:35.)

For the next nine minutes, Pritchette is questioned.  Sergeant-1 begins by stating that he wants to speak to Pritchette about the robbery of the phone store.  (18:30:50.)  Sergeant-1 then states that he knows Pritchette has "a problem" and that Sergeant-1 can ask – although he cannot make any promises – about the possibility about getting Pritchette into a "program" rather than

jail time.  After discussing Pritchette's drug use, Sergeant-1 asks, "what happened in Metro

PCS?"  (18:33:48.)  Pritchette explains that he saw there was only one girl working; he watched

her speaking with someone who might be her boyfriend, "and when he left, I just ran in there . . .

to do what I had to do."  Sergeant-1 asks what Pritchette took from the store, and the defendant

says he took "five phones and some money that was in the till."  (18:34:10.)  When Pritchette

says he took $650, Sergeant-1 repeats incredulously, "650?  And five phones?"  (18:34:34.)  The

defendant responds, "I don't know where they got this other stuff.  They're talking about . . .

twenty-two phones, and four thousand in cash.  I'm like, where did that come from?"[2]

Pritchette describes various details of the crime, such as how he found the gun in a

dumpster and took the store clerk into the back room by her hair (18:34:53), and that he used

some of the money to stay in a Crotona Park hotel afterwards (18:37:06).  When Sergeant-1 is

confused by Pritchette's statement that he "picked [the gun] up and just left with it" (because the

gun had been left behind at the cell phone store), Pritchette says "no" and explains what he

meant – that he was referring to when he first found the gun before he committed the robbery.

(18:35:10.)  And again when Sergeant-1 misunderstands Pritchette's comment that he had gloves

on when he handled the gun (because the video surveillance shows he was not wearing gloves

during the robbery), Pritchette says "no" and explains that he is referring to wearing gloves when

he took the gun from the dumpster.  (18:36:05.)

Sergeant-1 asks whether Pritchette knows the person who was in the store prior to the

_____

[2] While Pritchette does not say in the April Interview whom he is referring to by "they," in the
subsequent May Interview he explains that the TV and news reports on the robbery – which
described him in detail ("I was on the news . . . channel 12 news, they said it was me" (May
Interview at 9:27:50)) – had reported a larger number of phones and cash were taken.  (*Id.* at
9:27:42.)  In the April Interview, Pritchette also later references acquaintances who recognized
his image on TV in relation to the robbery.  (18:39:40.)

robbery, who is seen on video speaking to Pritchette in front of the store.  (18:37:19.)  Pritchette

says that he'll say "hi" or "bye" to that person on the street, but the person did not know about

the robbery plan.  Pritchette explains that he committed the robbery as an impulse in the moment

because he was "sick" (meaning he needed heroin), tired, and hungry.  (18:37:38.)

Pritchette acknowledges that he had committed robberies before (for which he had served

time), but that since this robbery he has been "staying out of people's faces" because people

recognized him from TV reports on the robbery.  (18:39:20.)

After approximately nine minutes of post-*Miranda* questioning (18:40:00), Sergeant-1

and Detective-1 offer to get Pritchette some food; Pritchette requests a turkey and cheese

sandwich with a little mayonnaise and a Snapple.  (18:40:17.)  The sergeant and detective leave

the room, and Pritchette continues to smoke, tap the ash off his cigarette, and drink water.

Approximately three and a half minutes later, they come back and leave again with Pritchette.

The camera is turned off approximately one minute later.  (18:44:42.)

### C.      May 2, 2016 Post-Arrest Statement to Federal Authorities

On or about May 2, 2016, Pritchette was arrested by agents with the Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF") pursuant to a writ of habeas corpus *ad*

*prosequendum* issued in connection with the instant federal charges.  He was taken to an ATF

field office in the Bronx for processing, and while there spoke with an ATF agent ("Agent-1")

and an NYPD detective assigned to an ATF Task Force ("Detective-2").  This interview was

recorded as well (the "May Interview").

The video of the May Interview (Def. Ex. E)[3] shows Agent-1, Detective-2, and Pritchette

entering an interview room.  Detective-2 begins by explaining that the case has been charged

---

[3] Citations in this Section C are to the timestamps in the Defendant Exhibit E video.

federally instead of in the Bronx, which was both "a bad thing but also potentially a good thing." (9:22:15.)  Detective-2 says that "based on the direction you've already gone on this in the past, I think it could be potentially a good thing for you."  Detective-2 states that first there is some general arrest paperwork similar to what is done in the Bronx that needs to be done, and some other questions they want to ask, "but before we ask you anything we want to read you your rights."  (9:22:36.)

Detective-2 confirms that Pritchette reads and writes English, and then *Mirandizes* the defendant.  (9:23:19.)  Additionally, Detective-2 gives the defendant a written form containing these rights "so that you can read it as well."  (9:23:45.)  Detective-2 tells Pritchette that if he agrees with the statements on the form – including that he has "read this statement of my rights or it has been read to me and I understand these rights," that he is willing to answer questions without a lawyer present, and that he has not been threatened or received any promises – he can sign.  Detective-2 reiterates that the reason he asked whether Pritchette reads English is so that Pritchette can read the form himself.  Pritchette then signs the form (attached hereto as Exhibit A).  (9:24:17.)

After Pritchette signs the *Miranda* waiver form, Detective-2 suggests that Pritchette may be able to help himself through cooperation:

> If you're a guy, like you said you were, who's tired of, you know, nonsense, and potentially getting out from underneath your parole situation and this current situation, there are some openings for that, alright?  Not necessarily interested in Tony Pritchette, no offense, but I'm interested in what Tony Pritchette might be able to do for himself, might be able to do to help himself here.

(9:24:57.)  Before discussing other information the defendant might have, however, Detective-2 states that "before we get to that point, alright, just in terms of – you know, there's this thing called like quid pro quo, it's like this for that.  It's like, I've been honest with you. . ."  (9:25:19.)

6

Detective-2 explains that the defendant will be taken to federal court to appear before a judge, and that the prosecutor will ask Detective-2 what happened when he spoke to Pritchette. Detective-2 could be able to say that Pritchette is interested in helping himself – that "he realizes whatever mistakes he might have made, so be it, but he's also tired of the nonsense." (9:25:41.) Detective-2 says that the prosecutor would then ask, "well alright, what did he do as a good faith show?" (9:25:56.)

Detective-2 then tells the defendant that since he and Pritchette have never spoken before, Detective-2 wants to ensure that he has an accurate story of what happened on the day of the cell phone store robbery: "I've read the reports and everything, and I know what the other detectives put down, but not having been in that room, I'd like to hear it from you. Because I don't like inserting what might be my interpretation of someone's report into reality. . . . So why don't you just, as a show here . . . what happened that day?" (9:26:00.) Pritchette asks what the reports say, and Detective-2 reiterates that he is interested in what Pritchette has to say, not what the reports convey: "Look, I can't tell you what [the reports from the detectives] say because I don't want to put anything in your head. I'd rather get the truth as opposed to what a detective put down or what someone else is interpreting happened." (9:26:38.) Pritchette proceeds to explain how he committed the robbery.

During the nearly hour-long interview,[4] Pritchette discusses, among other things, how and why he chose the store to rob (9:28:42); the fact that he had previously been in the store when his wife was paying a bill (9:37:16); how he found the gun in a junkyard near the intersection of Leggett Avenue and Southern Boulevard (9:39:39) and thought it might be real

---

[4] The total amount of time during the one hour and forty-seven minute video that Pritchette spent with the agents – that is, not including periods when he was left alone in the interview room – is approximately 55 minutes.

due to its weight, so he kept it wrapped in a bag and did not touch it (9:29:34); how long the money he stole lasted (9:30:19); his use of a shopping cart to obscure the gun (9:37:43); his interaction with the store clerk during the robbery (including that she "wasn't getting paid enough" to give him any trouble during the robbery) (9:39:05); and details about the store clerk's boyfriend whom he spoke to before the robbery (9:28:10; 9:36:45).[5]  Pritchette also provides information about narcotics dealing at a drug needle exchange program (9:32:37) and people from whom he could obtain a firearm.  (9:41:00.)

## ARGUMENT

**I.    There Was No Impermissible Two-Step Process**

### A.    Applicable Law

"The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion," not "moral and psychological pressures to confess emanating from [other] sources."  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (internal citations and quotation marks omitted).  To prove a valid waiver of *Miranda* rights, the Government must show, by a preponderance of the evidence, that the defendant relinquished his rights voluntarily and that the defendant had a full awareness of the right being waived and the consequences of waiving that right.  *Id.*; *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).  Where the totality of the circumstances reveals an uncoerced choice and the requisite level of comprehension, a court may conclude that *Miranda* rights have been waived.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).  An "express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver, but is

---

[5] Pritchette is also shown an image from the video surveillance and identifies the person in the image as the person he was speaking to before the robbery.  (10:35:28.)

not inevitably either necessary or sufficient to establish waiver." *United States v. Meregildo*, No. 11 Cr. 576(WHP), 2012 WL 4378047, at *6 (S.D.N.Y. Sept. 24, 2012) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

The Supreme Court has twice addressed the admissibility of a confession obtained after a *Miranda* warning but preceded by the suspect's earlier, unwarned incriminating statements. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *Oregon v. Elstad*, 470 U.S. 298 (1985). Under *Seibert*, a post-warning confession will generally be excluded if a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," unless certain curative measures (such as a substantial break in time) are taken. 542 U.S. at 622 (Kennedy, J., concurring in judgment).

In assessing whether a later *Mirandized* interview is tainted by a deliberate two-step interrogation process, courts look to five factors: "[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." *United States v. Williams*, 681 F.3d 35, 40 (2d Cir. 2012) (alterations in original) (quoting *Seibert*, 542 U.S. at 615).

Similar factors are considered if, even without a deliberate two-step interrogation process, a prior statement has been found involuntary. *See United States v. Taylor*, 745 F.3d 15, 25-26 (2d Cir. 2014) ("In deciding whether a second confession has been tainted by the prior coerced statement, 'the time that passes between confessions, the change in place of interrogations, and the change in identity of interrogators all bear on whether that coercion has carried over into the second confession.'" (citing *United States v. Anderson*, 929 F.2d 96, 102

9

(2d Cir. 1991))).

### B.     Discussion

#### 1.     April Interview

In his declaration, the defendant claims that prior to the April 1, 2016 *Mirandized* statements elicited by the NYPD and captured on video, he was subject to unwarned interrogation, creating a material factual dispute.  Therefore, the Government consents to a hearing on this narrow issue.  The Government anticipates that testimony at the hearing will prove that no two-step process was employed.

#### 2.     May Interview

Assuming, *arguendo*, after conducting a hearing the Court determines that an impermissible two-step interrogation process was used by NYPD officers during the April Interview, or after reviewing the tape of the April Interview the Court determines that Pritchette's statements were involuntary, neither finding provides a basis for suppressing the statements made one month later in the May Interview.

Under the *first* and *second* factors of the two-step interrogation analysis, although both interviews understandably touched on the same topic – the robbery – the details discussed in each were different.  The April Interview, which was much briefer than the May Interview, discussed the basics of the crime and what Pritchette had spent the stolen money on, but did not otherwise delve much into the details.  For example, it was only in the May Interview that Pritchette described in detail how he had come up with the plan to rob the store, that he had been in the store before, why he had used a shopping cart, and the specific junkyard in which he found the gun.  It was also only in the May Interview that Pritchette discussed other crimes he had knowledge of.  Thus, the "completeness and detail" of the two interviews – one approximately

twelve minutes long, and the other nearly an hour – differed.

*Third*, the timing and setting of the interviews was markedly different.  Pritchette was interviewed at two different locations – an NYPD precinct and an ATF field office – over a month apart.  Courts have found that a difference of several *hours* is a factor that counsels against suppression, *see, e.g.*, *United States v. Moore*, 670 F.3d 222, 233 (2d Cir. 2012) (ninety-minute "break in momentum" allowed defendant "to appreciate that he retained the right to remain silent"), and here a vastly greater time elapsed between the two sets of statements.  This time gave the defendant "ample opportunity to reassess his situation" and decide whether to continue to waive his rights.  *United States v. Troche*, 181 F. Supp. 2d 340, 350 (S.D.N.Y. 2002) (citing *United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992) (lapse of three hours sufficient)).

*Fourth*, there was no overlap in police personnel between the two statements; the law enforcement officers involved in the April Interview were not present or involved in the May Interview and vice versa.  In the May Interview, the detective and ATF agent even discussed the fact that the case was being prosecuted federally and how that differed from a Bronx prosecution, so Pritchette was aware of the difference in not just personnel but also jurisdiction.

*Fifth*, the detective conducting the May Interview did not treat the questioning as a continuation of the April Interview, but instead expressly said that he wanted to hear the truth about what happened from Pritchette and not rely on what others had reported.  The detective even suggested that other reports of what had happened could be inaccurate so he wanted to hear things directly from Pritchette.  Thus, Pritchette was asked opened-ended questions about "what happened that day."  This is in contrast to circumstances found to be impermissible where "the investigators use[d] the information obtained from [earlier] questioning to cross-examine [the

defendant] or compel him to answer due to the weight of an earlier admission." *Moore*, 670 F.3d at 232 (also noting that "[t]he 90–minute interval was enough time for Moore to have reasonably believed that the second interrogation was not merely a continuation of the first.").

Based on all of these factors, even if this Court finds that statements Pritchette made during the April Interview to NYPD officers should be suppressed, his May 2 statements were not tainted by the earlier statements.

## II.        **The Defendant's Statements Were Voluntary**

### A.        **Applicable Law**

When a statement or confession is obtained from a defendant in custody, the Government must demonstrate that the defendant was informed of, and validly waived, his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  A related but distinct requirement is that a defendant's statement must be voluntary.  A statement is not voluntary within the meaning of the Fifth Amendment if it is obtained by "techniques and methods offensive to due process or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Elstad*, 470 U.S. at 304 (internal citations and quotation marks omitted). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1987).  The critical issue relevant to voluntariness is whether the defendant's will was "overborne" by the conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (internal citations and quotation marks omitted).

12

In evaluating the totality of the circumstances, courts should consider, among other things, the age of the accused, education level, intelligence, advice regarding constitutional rights, length of detention, repeated and prolonged nature of the questioning, and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Compliance with *Miranda*, although not dispositive, is a significant factor weighing in favor of a finding of voluntariness. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). In addition, "prior experience with the criminal justice system" can indicate that the defendant understood his rights and the consequences of waiving them. *United States v. Santiago*, 174 F. Supp. 2d 16, 25 (S.D.N.Y. 2001); *see also United States v. Spencer*, 995 F.2d 10, 12 (2d Cir. 1993) (knowing and voluntary waiver indicated by, among other things, fact that "this arrest was not [the defendant's] first encounter with the criminal justice system").

Even a seriously ill patient may give a knowing, voluntary, and intelligent waiver of his *Miranda* rights. *See, e.g.*, *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding statement given at ICU voluntary because defendant, despite being in significant pain, was alert and awake, and the interrogation relatively short). Similarly, evidence that a defendant was intoxicated when he waived his *Miranda* rights "does not preclude a finding of a knowing and intelligent waiver provided that [he] appreciate[s] the nature of the waiver." *Alvarez v. Keane*, 92 F. Supp. 2d 137, 150 (E.D.N.Y. 2000); *see also United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) ("Even if [defendant] was intoxicated by PCP at the time of his confession . . . the evidence shows that he understood his rights and knowingly waived them"); *Avincola v. Stinson*, 60 F. Supp. 2d 133, 160 (S.D.N.Y. 1999) (defendant displaying "physical manifestations" of drug use was alert, so *Miranda* waiver was knowing and voluntary); *United States v. DiLorenzo*, 94 Cr. 303(AGS), 1995 WL 366377, at *8-9 (S.D.N.Y. June 19, 1995)

(defendant who waived *Miranda* rights orally and in writing did so knowingly and voluntarily despite alleged exhaustion and alcohol intoxication).

**B.    Discussion**

**1.    The April Interview Was Voluntary**

The totality of circumstances surrounding the April 1, 2016 interrogation supports a finding of voluntariness.  Most importantly, Pritchette was read and acknowledged his *Miranda* rights one by one, and was expressly told to ask for clarification if he did not understand any. His express, videotaped statement that he knew and understood his rights is a significant factor weighing in favor of voluntariness.  *See United States v. Chavez*, No. 3:14-CR-00185(JAM), 2015 WL 1650838, at *7 (D. Conn. Apr. 14, 2015) (video showing defendant's repeated statements that he understood his *Miranda* rights "suffice[d] to establish by more than a preponderance of the evidence that the waiver was knowing and voluntary").

The other factors also support a finding of voluntariness.  The defendant is in his 40s, and he does not indicate he has any mental impairment.[6]  He has been arrested before and by his own admissions is very familiar with criminal procedures; indeed, he stated as much during the interview.  (*See* April Interview at 18:29:50 ("I probably know [my rights] by heart.").)  The interrogation was quite brief – approximately twelve minutes – and took place in the evening around 6:30 p.m. after Pritchette had been held for approximately an hour since his arrest, which is well within the length of time that courts have found does not render a statement involuntary. *See, e.g.*, *United States v. Shehadeh*, 586 F. App'x 47, 48 (2d Cir. 2014) (voluntary statement

---

[6] The defendant does state in his Declaration that "in the past" he has been diagnosed with depression and bipolar disorder.  Def. Decl. ¶ 8.  The defendant does not claim that he was exhibiting symptoms of either disorder at the time of his arrest, or that any such symptoms would have prevented him from giving voluntary consent.

after a four-hour interrogation); *United States v. Medina*, 19 F. Supp. 3d 518, 541 (S.D.N.Y. 2014) (statements voluntary despite being in custody for seven to eight hours before being given *Miranda* warnings).  The sergeant's and detective's demeanor was friendly; they offered him cigarettes and water, and asked him what he wanted to eat.  Pritchette was not deprived of food or sleep for any period of time, and suffered no physical punishment.

The defendant disputes none of this.  Instead, he argues that because he had used heroin the day of his arrest, and was "still under the influence of these drugs" when he was arrested, his statements were not voluntary.  Def. Decl. ¶ 4.  He further states that he was "exhausted and not fully with it," and felt "woozy and half-asleep."  *Id.*  Finally, Pritchette states that he "do[es] not think that [he] would have talked to police if [he] had not been under the influence of drugs."  *Id.*

A defendant's intoxication, while relevant as part of the totality of the circumstances, is not dispositive.  *See United States v. Wyche*, 307 F. Supp. 2d 453, 463 (E.D.N.Y. 2004) ("A statement may still be voluntarily given even when the speaker is intoxicated or under the influence of drugs, as there is no *per se* rule that a confession given under such circumstances is involuntary."); *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998) (statement was voluntary where drugs taken did not impair defendant's mental capacity); *United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997) (statement voluntary despite claim that defendant was experiencing effects of crack cocaine, sleep deprivation, and a hand injury; he was alert, coherent, and possessed capability of making informed and voluntary choices); *DiLorenzo*, 1995 WL 366377, at *8-9 (defendant knowingly and intelligently waived *Miranda* rights despite his claim that he was exhausted and under the influence of alcohol, where he stated that he understood rights and signed form confirming that he understood); *United States v. Grant*, 427 F.

15

Supp. 45, 50 (S.D.N.Y. 1976) (statement voluntarily given by intoxicated defendant where "he was under control of his senses and fully understood the consequences of his statements").

The primary question is whether the defendant's "will was 'overborne' by the police, so that the defendant is not using such faculties as he has." *Taylor*, 745 F.3d at 25 (internal citations omitted). A "diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (internal quotation omitted). Thus, even if a defendant suffers from a weakened mental state, "one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that [law enforcement officers] engaged in some type of coercion." *Id*. (holding that, because the defendant did not allege facts showing that agents acted coercively to obtain his statements during the interview, there was no basis for a suppression hearing).

Pritchette only claims that he was "woozy" and "not fully with it," and that he "think[s]" he would not have confessed if he "had not been under the influence of drugs." He does not claim his will was overborne by police coercion, and the videotape confirms that it was not. The sergeant and detective were calm and did not shout, badger Pritchette, or wear him out through lengthy or repetitive questioning. The questioning was brief, and the defendant gave coherent, responsive answers to each question he was asked. He recalled details of the crime committed two weeks earlier, including his planning, his feelings at the time, and what he did with the proceeds (including the hotel he stayed in).[7] On two occasions when the sergeant misunderstood something, far from being overborne, Pritchette stated "no" and corrected him. In terms of

---

[7] The defendant's statements in the May Interview – which were made without being reminded of his prior statements – were generally consistent with those made in the April Interview, indicating that Pritchette's memory at the time of the April Interview was not impaired.

demeanor, although Pritchette mumbled somewhat, he also mumbled in the May Interview. He was slightly slouched and looked down for much of the interview, but did not fall asleep or need to be refocused on the questions he was being asked; even after the sergeant and detective left the room for several minutes at the end, Pritchette remained awake – drinking water, smoking a cigarette, and tapping off the excess ash.

This is all a far cry from the case cited by the defendant where drug use was found to render a confession involuntary. In *Taylor*, 745 F.3d 15, the defendant, who claimed to have attempted suicide by taking a bottle of Xanax pills during his arrest, was "in and out of consciousness while giving his statement, and in a trance or a stupor most of the time when not actually asleep." *Id.* at 25. Detectives testified that it seemed like the defendant's body was "somewhat shutting down," and the next morning psychiatrists found that he "'presented with a thought disorder,' drooled, was vague, stared blankly, and '[h]is thoughts lacked spontaneity.'" *Id.* at 20-21. Even on those facts, the court admitted it was a "close case." *Id.* at 19.

Pritchette is not comparable to the extreme of *Taylor*, but instead is in line with cases such as *United States v. Simmonds*, 641 F. App'x 99 (2d Cir. 2016), where the defendant claimed to be too intoxicated to have given consent. The *Simmonds* court distinguished *Taylor* and found the statements voluntary because the defendant was "coherent and able to answer [the officers'] questions" and "he seemed to understand what [the officers] were talking about." *Id.* at 105. Similarly, in *United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000), the defendant claimed that the effects of heroin withdrawal rendered his confession involuntary. During his confession the defendant indicated discomfort from the effects of withdrawal, but stated that he understood his *Miranda* rights, recalled details of the robberies, and – due to his prior arrests – comprehended the significance of a *Miranda* waiver. *Id.* at 61-62; *see also United States v. Feola*, 651 F. Supp.

1068, 1119 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989) (defendant claimed he was "obviously in severe physical and emotional distress" due to heroin withdrawal, but court held "a confession offered under the pangs of heroin withdrawal, in the absence of coercive police activity, is not involuntary for *Miranda* purposes"); *Avincola*, 60 F. Supp. 2d at 160 (although defendant displayed "physical manifestations" of drug use including agitation, *Miranda* waiver was knowing and voluntary because defendant was "alert"; defendant's "suggestion that the detective switch from English to Spanish is strong indication that he did not lack the capacity to appreciate the nature and consequences of his statements, his drug use notwithstanding").

Pritchette has failed to articulate any way in which the police overbore his will such that his post-*Miranda* statements were rendered involuntary.[8]  Accordingly, upon a finding that there was no impermissible two-step interrogation process, his motion to suppress the April Interview statements should be denied.

### 2.     The May Interview Was Also Voluntary

Finally, the defendant argues that certain statements made by Detective-2 during the May

---

[8] Pritchette claims that his waiver was not *voluntary* due to either the alleged two-step interrogation or his drug use, and does not seriously claim that his oral waiver was made without full *awareness* of the rights being waived or the consequences.  To the extent Pritchette does make such a claim, it is unfounded.  Aside from his verbal affirmation of each *Miranda* right, he stated that "I know my rights" as Detective-1 began to read them, and later said that he probably knew his rights "by heart."  *See United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990) (knowing waiver when defendant "expressed an understanding of his rights, indeed interrupted the agent who advised him of his rights, to indicate . . . his familiarity with them."); *see also United States v. Rijo-Carrion*, No. 11-CR-784(RRM), 2012 WL 6617388, at *5 (E.D.N.Y. Dec. 19, 2012) ("A defendant's indication at the time the warnings are given that he understands them and wants to speak to police is strong evidence of a knowing waiver.").  Furthermore, Pritchette did not display any confusion or other indication that he did not understand the rights that were read to him.  Any impairment from drug use thus did not render him unable to knowingly waive his rights.  *Cf. Toste v. Lopes*, 701 F.Supp. 306, 313-14 (D. Conn. 1987) (although psychological testimony indicated that petitioner was "mildly retarded" and of "dull normal intelligence," the evidence did not show an inability to knowingly waive his rights), *aff'd,* 861 F.2d 782, 783 (2d Cir. 1988) (per curiam).

Interview were misleading and therefore mandate suppression of that confession.  This claim is baseless and should be rejected.

As an initial matter, Pritchette agrees that law enforcement agents can permissibly inform a defendant of potential benefits of cooperating[9] or even "mislead a defendant or make promises of leniency without rendering any subsequent statements involuntary."  (Def. Br. 16.)  However, he claims that statements made by Detective-2 were "the sort of false and misleading legal advice that the Second Circuit condemned in *United States v. Anderson*."  (Def. Br. 15.)  This argument is belied by the videotape and therefore unpersuasive.

In *Anderson*, law enforcement agents coerced the defendant into waiving his rights and confessing by repeatedly telling the defendant that if he chose to have an attorney present during questioning, he would never be permitted to cooperate with the government at a later date.  929 F.2d at 97 (agents said that "this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us." (alterations in original)).  The *Anderson* court noted that this may have given the defendant "a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents," and therefore held that "[u]nder the totality of the circumstances, [the agent's] statements contributed to the already coercive atmosphere inherent in custodial interrogation and rendered [the defendant's] confession involuntary."  *Id.* at

---

[9] *See, e.g.*, *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive. Statements such as these are merely common sense factual observations." (internal citations omitted)); *United States v. Pomares*, 499 F.2d 1220, 1221 (2d Cir. 1974) (agent can permissibly say that defendant "was his own best lawyer, and that the wisest course of action would be to cooperate with the government rather than exercise his right to remain silent").

100, 102.

The statements made to Pritchette during the May Interview lack any similarity to those found impermissible in *Anderson*.  Unlike in *Anderson*, the detective did not suggest that Pritchette would be unable to cooperate at a future date if he did not speak to agents immediately without an attorney, but merely stated the fact that a prosecutor faced with a potential cooperating defendant would want to know how serious that defendant was about cooperation. *Cf. United States v. Chan*, No. 06 CR. 611 (JSR), 2006 WL 3155695, at *1-2 (S.D.N.Y. Oct. 31, 2006) (agent could permissibly tell defendant "that he had to choose between talking immediately, which would presumptively give him the maximum benefit obtainable through cooperation, or taking the risk that subsequent proffers of cooperation might be rejected as too late"; "[a]lthough the words that defendant here attributes to the agent may not have put this choice with ideal refinement, it was substantially an accurate statement of the choice facing defendant – and totally unlike the plainly false statements in *Anderson*.").

Furthermore, even though law enforcement may permissibly lie to defendants, none of the statements here were untrue.  Pritchette alleges that the detective's vague statement that cooperation could help Pritchette "potentially get[] out from underneath [his] parole situation and this current situation" is "obviously [a] lie[]."  (Def. Br. 15.)  But although a federal prosecutor cannot unilaterally alter another jurisdiction's proceedings, a prosecutor can – and often does – inform another jurisdiction (whether that be a parole officer, another prosecutor, or a sentencing court) of a defendant's cooperation.

Pritchette also asserts it was a "lie" to say that the prosecutor would ask the detective what the defendant did "as a good faith show" if the detective told the prosecutor that Pritchette was interested in cooperating.  Again, this statement is not inaccurate.  Prosecutors do ask if a

defendant made any statements after arrest, and take that into account when considering the disposition of the case.  Furthermore, it would be odd for a prosecutor to be told that a defendant wanted to cooperate but was not willing to take responsibility for any crimes, particularly the one he was charged with; prosecutors in this district therefore expect a defendant to start by admitting guilt to the charged crime before turning to other crimes he may know about.  And a defendant's early cooperation is a fact emphasized by both the Government and defense in sentencing submissions.

Even if the statements were untrue, however, "lies told by the police do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances."  *United States v. Egipciaco*, 389 F. Supp. 2d 520, 526 (S.D.N.Y. 2005) (citing *United States v. Velasquez,* 885 F.2d 1076, 1088 (3d Cir. 1989)); *see also Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns").  The totality of the circumstances here demonstrates that even if the detective's statements are considered untrue, they do not reach the level of coercion in *Anderson*.  Pritchette was told that cooperation could be beneficial, but was never told that he would lose that chance if he met with an attorney.  Absent any other factors that purportedly rendered the May Interview coercive – and the defendant has identified none – the Court should readily dispose of this claim without holding a hearing.

## **CONCLUSION**

For the foregoing reasons, the Government consents to a hearing on the sole issue of whether an impermissible two-step interrogation process was employed, and asks the Court to deny the defendant's motion to suppress on all other grounds.

Dated:  September 9, 2016
      New York, New York

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

By:     _____
                                        Catherine E. Geddes
                                        Assistant United States Attorney