G9kWpriH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                           16 Cr. 331 (WHP)

5

   TONY PRITCHETTE,
6
                                          Hearing
7            Defendant.

8  ------------------------------x

9                                         New York, N.Y.
                                          September 20, 2016
10                                        2:15 p.m.

11

   Before:
12
                       HON. WILLIAM H. PAULEY III,
13
                                          District Judge
14

15                          APPEARANCES

16  PREET BHARARA
         United States Attorney for the
17       Southern District of New York
    CATHERINE E. GEDDES
18  ABIGAIL S. KURLAND
         Assistant United States Attorneys
19
    DAVID E. PATTON
20       Federal Defenders of New York, Inc.
         Attorney for Defendant
21  ANNALISA MIRON
    SARAH J. BAUMGARTEL
22

23

24

25

1      (Case called)

2           THE COURT:  Good afternoon.  Please be seated.

3           MS. GEDDES:  Good afternoon, your Honor.  For the

4    United States, my name is Catherine Geddes.  I'm joined by my

5    colleague AUSA Abigail Kurland and Paralegal Sarah Pyun.

6           THE COURT:  All right.  Good afternoon to all of you.

7           MS. MIRON:  Good afternoon.  Federal Defenders by

8    Annalisa Miron, Sarah Baumgartel, and Rheem Brooks, on behalf

9    of Mr. Tony Pritchette.

10          THE COURT:  Good afternoon to you and I note the

11   presence of the defendant at counsel table.

12          This matter is on for a suppression hearing.  Are the

13   parties ready to proceed?

14          MS. GEDDES:  Yes, your Honor.

15          THE COURT:  Would the government call its first

16   witness.

17          MS. GEDDES:  Yes.  The government calls Sergeant

18   Michael J. LoPuzzo.

19    MICHAEL LoPUZZO,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22          THE COURT:  You may inquire.

23          MS. GEDDES:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MS. GEDDES:

1    Q.   Good afternoon, Sergeant.   Where do you work?

2    A.   For the New York City Police Department, 40th Precinct

3    detectives squad.

4    Q.   How long have you worked for the NYPD?

5    A.   Since January 4, 1984.

6    Q.   And what kind of crimes does the 40th Precinct detectives

7    squad investigate?

8    A.   Any crimes that need follow-up investigation, anything from

9    petty larceny to homicides.

10   Q.   How long have you worked in that precinct?

11   A.   I was assigned there in 1984.

12   Q.   And how long have you been a sergeant?

13   A.   Going on 25 years now.

14   Q.   Generally speaking, what are your duties and

15   responsibilities as a sergeant?

16   A.   I'm, I'm the commanding officer of the 40th Precinct

17   detectives squad, so I'm in charge of 20 investigators, and I

18   oversee all the cases that are assigned to each investigator.

19   Q.   How many arrests have you been involved in as a sergeant?

20   A.   Hundreds.

21   Q.   Have you received any training on conducting postarrest

22   interviews?

23   A.   Yes, more recently for video interrogations, which are now

24   in every -- almost every detectives squad in the city.

25   Q.   Can you generally describe the training that you've

1    received relating to postarrest interviews?

2    A.  I went to two three-day trainings and one two-day training,

3    basically to get us familiar with how the equipment works and

4    how to conduct investigations and interrogations.

5    Q.  And when was the most recent training that you attended?

6    A.  In 2015, last year, was the last one.

7    Q.  During your career as a sergeant, have you participated in

8    postarrest interviews of suspects?

9    A.  Yes.

10   Q.  Approximately how many?

11   A.  Well, hundreds.

12   Q.  What is your practice regarding the number of investigators

13   who take part in a postarrest interview?

14   A.  There's no set rule, but I like two investigators to be in

15   the room.

16   Q.  Out of the hundreds of interviews that you said you've

17   participated in, for approximately how many were you the only

18   investigator present at that interview?

19   A.  Recorded interviews?

20   Q.  Any interviews.

21   A.  Probably less than five.  Three maybe.

22   Q.  And you mentioned video recording earlier.  When did the

23   40th Precinct detectives squad begin recording interviews?

24   A.  March or April of 2013 our room was finished and up and

25   running.

1    Q.  Approximately how many video-recorded interviews have you

2    participated in?

3    A.  Supervised over or actually spoken?

4    Q.  Where you sat in the room during the video interview.

5    A.  Probably 75.

6    Q.  Under what circumstances is an interview recorded at the

7    40th Precinct detectives squad?

8    A.  There's certain criterias that we follow.  Originally we

9    were, started out with just assault 2s.  Then everyone did

10   homicides.  And now there's a wide variety of robberies,

11   burglaries, grand larcenies, and I have the authority to

12   actually say, OK, we're going to do a video on this case.  So I

13   have that option as a supervisor.

14   Q.  But among the ones you mentioned, the homicides and

15   robberies, are those typically video recorded?

16   A.  All homicide arrests are -- we attempt to do a video.

17   Robberies, if the detectives squad is making that arrest, we

18   video record that interview.  If it's a patrol arrest that

19   we're enhancing, we just do a written interview or oral

20   interview.

21   Q.  Are you familiar with the term "pedigree information"?

22   A.  Yes.

23   Q.  What does that refer to?

24   A.  Name, address, date of birth.

25   Q.  And do you generally video record the taking of pedigree

1   information?

2   A.  Not, not as a rule, no.

3   Q.  Generally speaking, who takes the pedigree information from

4   a suspect?

5   A.  It's usually the arresting officer or sometimes

6   apprehending officer.

7   Q.  In the 40th Precinct detectives squad, where do interviews

8   of suspects take place?

9   A.  We have an interrogation room, interview room.

10  Q.  Where is that room located?

11  A.  In the detectives squad, right -- if I'm sitting at my

12  desk, right to the left of my office.

13          MS. GEDDES:  Your Honor, may I approach the witness?

14          THE COURT:  You may, and you don't have to ask

15  permission.  Just don't charge in.

16          MS. GEDDES:  Thank you, your Honor.

17  Q.  Sergeant, I've given you what's been marked as Exhibit 4.

18  A.  Yes.

19  Q.  Do you recognize this document?

20  A.  Yes.

21  Q.  What is it?

22  A.  It's a photograph of my office, the detectives squad

23  office.

24  Q.  And is this a fair and accurate representation of the

25  detectives squad office as it appeared on April 1, 2016?

1    A.  With the exception of some of the papers that might be

2    scattered around, yes.

3           MS. GEDDES:  Your Honor, the government offers Exhibit

4    4 into evidence.

5           THE COURT:  Any objection?

6           MS. BAUMGARTEL:  No objection.

7           THE COURT:  Government Exhibit 4 is received in

8    evidence.

9           (Government Exhibit 4 received in evidence)

10   Q.  Sergeant, can you please describe what Exhibit 4 shows, and

11   I will give you this laser.  If you can just describe and

12   explain where it is you're referring to so that everyone can

13   understand what you're referring to, please.

14   A.  Yes.  Want me to do it off the screen?

15   Q.  Sure, yes.

16   A.  Straight ahead in the center, that's the interrogation

17   room.  You could see the sound panels that are on the wall.  To

18   the right of that room is the holding cell that's up on the

19   second floor in the detectives squad, and the room on the far

20   left is actually my office.

21   Q.  And in this Exhibit 4 photograph, does it show where the

22   detectives in the squad sit?

23   A.  The photo itself is taken on the squad side.  There's a

24   four-foot wall that runs through the squad where there's

25   actually wires in there for the computers.  The squad

 1    detectives sit to the right of that wall.  The robbery,

 2    burglary, grand larceny detectives sit on the left of that

 3    wall, which is closer to the cells and the interview rooms.

 4    Q.  So is this the view that someone from the detectives' desks

 5    would have of the rest of the office?

 6    A.  Yes.

 7    Q.  Sergeant, what is the process for recording an interview on

 8    video in your precinct?

 9    A.  When, when you say the process --

10    Q.  Sure.  Who records the video when an interview is going to

11    be recorded?

12    A.  I usually assign the detective that's working and I'll ask

13    him, Can you run the video machine for me, because they've been

14    trained.  They'll come in and they'll sit down and start

15    setting up the machine.

16    Q.  When you say they'll sit down and start setting up the

17    machine, can you explain where they sit down?

18    A.  Actually right in front of my desk.  There's a standalone

19    computer that's there solely for the purpose of recorded

20    interviews.

21    Q.  I've handed you what's marked as Exhibit 3.  Do you

22    recognize that?

23    A.  Yes, I do.

24    Q.  And what does that show?

25    A.  In the, in the foreground is my desk and the computer

 1    screen.  Directly in the front is the computer that's set up

 2    for the interview room.

 3    Q.  And is that a fair and accurate depiction of the area of

 4    your office and the computers as it was on April 1, 2016?

 5    A.  Except for some paperwork I see on that computer desk, yes.

 6    Q.  So what steps are taken to record an interview?

 7              MS. GEDDES:  Excuse me.

 8              Your Honor, the government would request that Exhibit

 9    3 be accepted into evidence.

10              MS. BAUMGARTEL:  No objection.

11              THE COURT:  Government Exhibit 3 is received in

12    evidence.

13              (Government Exhibit 3 received in evidence)

14    Q.  Sergeant, what steps are taken to record an interview?

15    A.  The detective that I ask or assign to run the machine,

16    he'll come in there and there's a chair right to the left of my

17    office that actually holds the door open.  He'll pull that

18    chair up to that computer.  He'll ask some basic questions:

19    what's the report number; what's the case number; what's the

20    subject's name who is being interviewed; who is the case

21    detective?  He starts up the computer.  When that computer runs

22    the program, three separate screens will come up on there,

23    because in the interview room, there's three cameras.  Once he

24    sees all those cameras are functional, there's a little

25    annotation log that he starts filling out.

1    Q.  And referring to Government Exhibit 3, is the computer that

2    you're referencing in this exhibit?

3    A.  Yes.  It's the one that has the fan on the wall, right to

4    the right of it.  That's the computer I'm talking about.

5    Q.  And what is the computer on the left side of Exhibit 3?

6    A.  Those are monitors on my desk.  That's for separate --

7    those are for my cases.

8    Q.  How is the video in the interview room turned on and off?

9    A.  Through that computer.  That detective that's doing the

10   monitoring, he turns the system on.  He makes sure everything's

11   working.  If you look in that picture, there's a plastic tub

12   there.  We're required to burn three copies.  He has to do

13   transmittal sheets, one for the D.A., one for the legal bureau,

14   and one for the detective to voucher into his case.  So he

15   starts filling those transmittals out.  He has to do stickers

16   that go on the envelopes with date, time, case number, so

17   there's a procedure he has to go through before we begin.

18   Q.  Can the video be turned on or off from within the interview

19   room?

20   A.  From in the room itself, no.

21   Q.  Sergeant, generally speaking, when do you read <u>Miranda</u>

22   rights to a suspect?

23   A.  Before we get into questioning about the incident that

24   we're investigating.

25   Q.  When you're conveying <u>Miranda</u> warnings to a person you're

1   about to interview, what, if anything, do you do to verify that

2   the person has understood those warnings?

3   A.   The only thing I'll ask is just to answer yes or no, not to

4   nod or say uh-huh, if you don't understand the question, ask

5   me, I'll explain it to you.

6   Q.   During postarrest interviews that you conduct with another

7   investigator, how is it decided who asks the questions?

8   A.   It's kind of let's see how it goes in here.  A lot of times

9   I'll go in and even before Miranda, I'll say, What's your name,

10  where do you live, do you have any kids, just to start a

11  rapport.  If I see the guy's receptive, sometimes I'll just go

12  into the questions.  If during the questioning the subject is

13  looking at the detective like he wants the detective speak,

14  I'll let him speak.  It all depends on the situation.

15  Q.   Directing your attention to April 1, 2016, were you working

16  that day?

17  A.   Yes, I was.

18  Q.   What was your shift?

19  A.   I start at 7:45 and I completed at 1600, so eight to four.

20  Q.   When you say you completed your shift at 1600, does that

21  mean that you went home at that time?

22  A.   No.  That's the tour I was assigned that day.

23  Q.   Was an arrest effectuated that afternoon by your detectives

24  squad?

25  A.   Yes.

1    Q.   Who was arrested?

2    A.   Tony Pritchette.

3    Q.   And whose case was that?

4    A.   Detective Castillo.

5    Q.   Did there come a time that day when the defendant Tony

6    Pritchette was brought to your precinct?

7    A.   Yes.

8    Q.   Approximately what time was that?

9    A.   1750, which is ten to six in the evening.

10   Q.   Sergeant, I've handed you what's been marked as Exhibit 5.

11   Do you recognize this?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a photocopy of the precinct command log.

15   Q.   What is a command log?

16   A.   Each precinct has a desk officer assigned.  He's in charge

17   of everything that happens in that precinct.  That desk officer

18   makes a written log of any arrests and any property.  Anything

19   that happens during that day in that precinct, he records in

20   that log.

21   Q.   And do you know where this specific page comes from?

22   A.   This is the command log for April 1, 2016.

23   Q.   Under what circumstances are entries put into this log?

24   A.   Like I said, the desk officer is ultimately responsible for

25   anything that happens in the command, so he, he logs arrests in

1   there.  Anytime an arrestee is brought into the precinct, that

2   gets logged in there.  Prisoners going out from the precinct to

3   central booking, he'll make an entry for that.  Property that's

4   vouchered he'll make entries for that.  Anything that happens

5   in that precinct he'll make an entry for.

6   Q.  And where is this desk located within the precinct?

7   A.  In the main lobby, as soon as you walk into the precinct.

8   Q.  And what floor is your detectives squad located on?

9   A.  Second floor.

10          MS. GEDDES:  Your Honor, at this point the government

11  requests that Exhibit 5 be admitted into evidence.

12          THE COURT:  Any objection?

13          MS. BAUMGARTEL:  No objection, your Honor.

14          THE COURT:  Government Exhibit 5 is received in

15  evidence.

16          (Government Exhibit 5 received in evidence)

17  Q.  Sergeant, looking at Exhibit 5, do you see an entry

18  relating to the defendant?

19  A.  Yes.

20  Q.  And what time is associated with that entry?

21  A.  1750.

22  Q.  What does that indicate happened at 1750?

23  A.  At 1750 that subject and escorting officers would literally

24  stand in front of that desk, give the sergeant -- could be a

25  lieutenant, whoever the desk officer -- give them a pedigree

1    sheet that lists the information, the name and pedigree of the

2    subject that they're bringing in.

3    Q.  After a defendant is logged for a detectives squad arrest,

4    where are they taken next?

5    A.  If they're transporting or escorting someone for my squad,

6    they'll bring them upstairs.  If it's a patrol arrest, they

7    stay on the ground floor.  They have their own holding pens.

8    Q.  How long does it take to get from the command desk to the

9    second floor detectives squad?

10   A.  Oh, a minute.

11   Q.  Turning back to April 1, 2016, did you see the defendant

12   arrive on the second floor at the detectives squad?

13   A.  Yes.

14   Q.  Where was he taken?

15   A.  Once you get to the second floor, the detectives are the

16   first door on the left.  When they come in that door -- the

17   door actually bangs, so I can tell when people are coming in

18   and out -- he'll be brought right to the front of the holding

19   cell.  I'll supervise them searching him and then have him

20   placed into the cell.

21   Q.  And did you see the defendant placed into the holding cell

22   on April 1?

23   A.  Yes.

24   Q.  Who put him into the holding cell?

25   A.  I don't recall.  I believe it was the two uniformed

1    officers, but I'm sure Detective Castillo had come over by

2    then.

3    Q.  Can you describe the holding cell at the 40th Precinct?

4    A.  Yes.  It's, it's a steel door that has a window with a

5    blind so that when anyone's in there, we can open the blind to

6    get a visual in there.  There's a three-foot space with two

7    blue chairs, with a bar that you can handcuff someone to, if

8    need be, and it's usually the case if prisoners are rowdy with

9    each other.  And then there's a mesh cell with two slide locks.

10   Q.  At the time the defendant was placed into the holding cell

11   on April 1, did you speak to him at that time?

12   A.  No.

13   Q.  Do you know who, if anyone, from the detectives squad took

14   his pedigree information on April 1?

15   A.  It would have been Detective Castillo.

16   Q.  Did there come a time on April 1 when you interviewed the

17   defendant?

18   A.  Yes.

19   Q.  What time was the interview?

20   A.  6:27, I believe it started.

21   Q.  And between approximately 5:50 when the defendant arrived

22   and 6:27 when you interviewed him, what were you doing?

23   A.  Squad commander duties, looking at other cases, giving

24   instructions to different detectives.

25   Q.  Sergeant, I've handed you what's been marked as Exhibit 6.

1    Do you recognize this?

2    A.   Yes.

3    Q.   What is it?

4    A.   DD-5s are put in a system called ECMS, electronic case

5    management system.  This is actually a supervisory tool where I

6    could put an investigator's tax number in there and a date, and

7    I can see what cases they typed on.

8    Q.   You mentioned a DD-5.  What is that?

9    A.   DD-5 is detectives memorializing what they did, what steps

10   they took in their investigation.

11   Q.   And Exhibit 6, is this a report that you generated?

12   A.   I printed this out, yes.

13   Q.   And what does it show?

14   A.   This shows my activity on my computer, different cases that

15   I went in and read 5s and approved and signed off on monthly

16   fliers, vouchers.

17   Q.   What types of activities would be captured in this report?

18   A.   Me actually reading a DD-5 and then putting my signature on

19   the bottom saying I approved it.

20   Q.   What time frame does this Exhibit 6 encompass?

21   A.   It looks like I signed off on the first one at 6:59 in the

22   morning, and my last activity is 1757, which is three minutes

23   to six in the evening.

24   Q.   And when you ran this report, does it cover the entire

25   activity for the date April 1?

1    A.  24 hours.

2              MS. GEDDES:  Your Honor, at this time, the government

3    offers Exhibit 6 into evidence.

4              MS. BAUMGARTEL:  Your Honor, may we voir dire very

5    briefly?

6              THE COURT:  You may.

7    VOIR DIRE EXAMINATION

8    BY MS. BAUMGARTEL:

9    Q.  Sergeant, is the case number that's listed on here

10   different from the complaint number?

11   A.  The numbers you see there are detectives' case numbers.

12   Each complaint number we refer to as a 61 number.  That 61

13   number correlates to the detective's case number.

14   Q.  Do you know what the case number is for this case that

15   we're here on today?

16   A.  Mr. Pritchette's?

17   Q.  Yes.

18   A.  It's 233.

19             MS. BAUMGARTEL:  I have nothing further, and we have

20   no objection.

21             THE COURT:  Government Exhibit 6 is received in

22   evidence.

23             (Government Exhibit 6 received in evidence)

24   BY MS. GEDDES:

25   Q.  Sergeant, if you reviewed a case without making any edits

1    to it or signing off on it, would that activity appear in this

2    log?

3    A.   This actually shows that I clicked on that DD-5 to read it.

4    I could reject it and put a note for the detective that I need

5    you to do this or do that before we close this case.  So these

6    are basically reports that I opened, read, and put my signature

7    on.

8    Q.   And if you had opened a report and printed it without

9    putting your signature on it, would that be captured here in

10   this report?

11   A.   I have the ability on my computer to go into any case and

12   review it and print it out, but it wouldn't show on here.

13   These are only cases that I actually put my signature on that

14   day.

15   Q.   On this document, Exhibit 6, under the section called

16   access history, can you explain briefly what these headings

17   show?  What is the access date?

18   A.   The first column there says access date.  That's the date

19   that I actually read it.  These are all from April 1, 2016.

20   The next one is the time.  That would be the time that I opened

21   the report.  The next one over is the case number.  That first

22   one we have on there is case 1175, and in that particular

23   case -- one, two, three, four -- I read six DD-5s that were in

24   that case.

25   Q.   Just going back to the third column called DD-5 number,

1    what does that mean?

2    A.   Each DD-5 they do is numbered.  Like their first DD-5 would

3    usually be a response to scene or interview of complainant.

4    But if it's a big case where there's multiple detectives, it

5    will automatically correlate by time.  Like if someone

6    interviewed someone at seven in the morning and the next guy

7    was 7:30, that 7:00 would become No. 1, and the detective has

8    the ability to number them in time order if he wants to.

9    Q.   What does the column called command indicate?

10   A.   263 is the 40th Precinct.  That's the command code for our

11   computer.

12   Q.   And topic/classification, what does that information show,

13   generally speaking?

14   A.   Usually each DD-5 it will ask, it will say topic, and you

15   could put anything you want in there, interview of a

16   complainant, canvassed for cameras, witness canvass.  So

17   whatever you label that, it will come up there.

18   Q.   And the last column, access function, what does that mean?

19   A.   If, instead of reading each 5 individually, I could hit

20   print case and all the 5s in that case will come up, and I

21   could read them in order like a book.

22   Q.   And what did you say the case number associated with the

23   defendant Tony Pritchette is?

24   A.   233.

25   Q.   Does his case have any other case numbers that would appear

1    in this type of log?

2    A.   In the log we're looking at now?

3    Q.   Correct.

4    A.   No.  This is strictly by case number, not by 61 number.

5    Q.   Have you reviewed what has been marked as Exhibit 6?

6    A.   Yes.

7    Q.   And do any of the entries relate to case 233?

8    A.   No.

9    Q.   You said that this wouldn't capture your activity if you

10   just opened a file to read it or print it, is that correct?

11   A.   This electronic case management system came into effect in

12   2007, so I have the ability to see a case sheet of 2007, case

13   No. 3, and I could print that up and read it.  It wouldn't show

14   on here, because I'm not putting my signature on it.  If I

15   elected to open that case and I put open case, now there would

16   be a 5 in there that says system generated, it's opened by me.

17   Q.   Outside of this log, do you recall whether you opened any

18   files relating to case 233 on April 1, 2016?

19   A.   No.  Not on April 1, no.

20   Q.   And just to clarify, Sergeant, my question, no, you don't

21   recall, or no, you didn't open anything?

22   A.   No, I didn't open any cases.

23   Q.   If you turn to the second-to-last page of Exhibit 6, page

24   8, can you explain what this shows after 1750, the time the

25   defendant arrived at the precinct?

1    A.  Which one?  I'm sorry.

2    Q.  On page 8, the second-to-last page, can you just explain

3    generally what this shows your activity was as captured in this

4    log after 1750?

5    A.  I see -- where am I?  I see 1751.  It looks like I'm

6    reading into case 1187.

7    Q.  And what time do the entries end?

8    A.  My last sign-off is 1757, which is three minutes to six in

9    the evening.

10   Q.  What does that indicate occurred after 1757?

11   A.  That after that I didn't go into my computer to read or

12   sign off on any cases.

13   Q.  What were you doing on April 1 between 1757 and 1827 when

14   you said the interview with the defendant began?

15   A.  Squad commander duties.  I was instructing Detective

16   Castillo to reach out for the complainant, because I was under

17   the assumption we were going to do a lineup that evening.  I

18   went out and asked Detective Caruso to come in and sit here.

19   And now my evening shift had been in for the day, so I was

20   giving instructions to them on things that I needed followed up

21   from reports I had read earlier that day.

22   Q.  During that time frame when you were in your office, who

23   else, if anyone, was in the same office with you?

24   A.  Detective Caruso, like I said, was sitting down, setting up

25   the machine.  And I have another sergeant that works for me,

1    Sergeant Fuentes, and he was in.

2    Q.  Where was the defendant at this time?

3    A.  He was still in the holding cell.

4    Q.  And how do you know that?

5    A.  Because it's my job to monitor all the prisoners.  Anyone

6    that's brought into my cell we have to keep track of.

7    Q.  On April 1, did there come a time when you took the

8    defendant to use the bathroom?

9    A.  Myself personally?  No.

10   Q.  If a suspect asks to use the bathroom, is it your practice

11   as a sergeant to take the defendant yourself?

12   A.  No.  Usually the case detective or the arresting officer,

13   they will take them to the bathroom.  Unless there's a

14   circumstance where he's not there, I'll just ask somebody else,

15   This guy's knocking on the door; could you take him to the

16   bathroom.

17   Q.  And which bathroom would they be taken to?

18   A.  On the ground floor, it's called the muster room.  It's

19   right past the desk.  There's a bathroom down there for

20   prisoners to use.

21   Q.  Turning back to the interview on April 1, who else, if

22   anyone, from the detectives squad was involved in that

23   interview?

24   A.  Myself and Detective Castillo in the room, and like I said,

25   officer -- Detective Caruso was monitoring the machine.

1    Q.   What was Detective Castillo's role in the interview?

2    A.   He took the prisoner from the holding cell, brought him

3    into the room, and he read him Miranda.

4    Q.   What was Detective Caruso's role in the interview?

5    A.   He was sitting at the machine monitoring the analogs.

6    Q.   What, if anything, did you see Detective Caruso doing to

7    prepare to record the interview?

8    A.   Oh, like I said, he turns on the machine.  He makes sure

9    all the cameras are operating.  He does the transmittal sheets.

10   He starts the stickers that go on the envelope that they're in,

11   that the disks go in, so that they could be distributed.

12   Q.   And do you recall approximately what time he came into the

13   room to begin those preparations?

14   A.   It had to be shortly after six, five after, ten after.

15   Q.   Once the video recording system was ready on April 1, what

16   did you do next?

17   A.   Once the machine is operating, we, we make a notation that

18   the room is ready, so I have to go in there and stick my head

19   in there.  If the chairs need to be adjusted, I adjust the

20   chairs.  Any garbage in there, I take it out.  Once the room's

21   ready and we're ready to go, I will shut the door to my office,

22   because when you come out of the cell, you could look in there,

23   and I don't want them to see that he's working on a computer.

24   I'll take him in and we'll start the recording.

25   Q.   Who brought the defendant Tony Pritchette from the holding

1   cell to the interview room on April 1?

2   A.   Detective Castillo.

3   Q.   And where were you when this happened?

4   A.   I'm standing right there, actually instructing everyone to

5   be quiet, because the mikes are very sensitive.

6   Q.   Did you speak to the defendant during that time when he was

7   being moved into the interview room?

8   A.   He asked me something about his hat, if he could bring his

9   hat with him.  I told him yeah.

10  Q.   Other than that, did you ask him any questions?

11  A.   No.

12  Q.   Was the video recording of the interview successfully made?

13  A.   Yes.

14  Q.   Have you watched that video?

15  A.   Just recently, yes.

16  Q.   Sergeant, I've handed you what have been marked as Exhibits

17  1 and 1T.  Turning first to Exhibit 1, do you recognize this?

18  A.   Yes.

19  Q.   What is it?

20  A.   This is a copy of the video interrogation DVD.

21  Q.   How do you know that's what it is?

22  A.   I have my initials and the date I viewed it on it.

23  Q.   Is there any part of your interview of the defendant on

24  April 1 that is not captured on that Exhibit 1 video?

25  A.   No.

1    Q.  Do you recognize what I've handed you as Government Exhibit

2    1T?

3    A.  Yes.

4    Q.  And what is that?

5    A.  This is a transcript of what was said on the video.

6    Q.  Did you assist in preparing that transcript?

7    A.  Yes.

8    Q.  And did you review that transcript for accuracy while

9    watching the video marked as Exhibit 1?

10   A.  Yes, I did.

11   Q.  How do you know that that's the transcript that you

12   reviewed?

13   A.  Again, my signature and the date are on it.

14   Q.  To the best of your knowledge, is that a fair and accurate

15   transcript of what was said during the video-recorded

16   interview?

17   A.  Yes.

18          MS. GEDDES:  Your Honor, the government offers

19   Exhibits 1 and 1T into evidence.

20          MS. BAUMGARTEL:  Your Honor, I haven't seen a copy of

21   the video.  Provided the government can represent that it was

22   made and was disclosed to us in discovery, which we have marked

23   Exhibit D, we have no objection to the video.  We do object to

24   the transcript being entered into evidence.  I think there are

25   some inaccuracies throughout the transcript, and the video

1    itself is evidence.  If the government wants to use the

2    transcript as a demonstrative aid throughout the testimony, we

3    don't object to that.

4              THE COURT:  In any event, the transcript itself is

5    just an aid so I'll receive it for that purpose and that

6    purpose only, but the video is received in evidence.

7              MS. GEDDES:  And the government does represent that it

8    is the same as the Defense Exhibit D and the video produced

9    during discovery.

10             (Government Exhibit 1 received in evidence)

11             MS. GEDDES:  At this time, with the Court's permission

12   and the assistance of Ms. Pyun, I'd like to show a short clip

13   of Exhibit 1, which is from time stamp 18:37:18 to time stamp

14   18:37:36.

15             THE COURT:  You may proceed.

16             MS. GEDDES:  And this is also transcribed on page 8 of

17   Exhibit 1T, beginning on line 15.

18             (Video played)

19   Q.  Sergeant LoPuzzo, when you said "that we see on the video,"

20   who are you referring to by "we" here?

21   A.  Myself and Detective Castillo.

22   Q.  And what video are you referring to in that question?

23   A.  There was several videos obtained that day of the incident,

24   one from in the store itself and one from, I believe, a grocery

25   store next door.  And we see a person of interest prior to

1    committing the robbery speaking to someone out there, and we

2    had a theory at the time that that guy might have set it up.

3    So when I say "the guy that we see in that video," I'm saying

4    me and Castillo had viewed that video.

5    Q.  And did you review that video with Detective Castillo?

6    A.  From the day it happened, probably for the first six or

7    seven days.

8    Q.  And in the screenshot that's up on the screen, can you

9    explain who is in this screenshot?

10   A.  Myself, Detective Castillo, and Mr. Pritchette.

11   Q.  Did you print out any photographs or stills from that

12   surveillance video you mentioned on April 1?

13   A.  No.

14   Q.  Have you ever printed out any videos or stills from the

15   surveillance video?

16   A.  No.

17   Q.  Did you show any videos or photographs to the defendant on

18   April 1?

19   A.  No.

20   Q.  Once the interview concluded, where, if anywhere, did you

21   take the defendant?

22   A.  The investigators will leave the room.  I'll stick my head

23   in to, in this case Detective Caruso, and I'll say, John, we're

24   finishing it.  In order to shut it off, we have to say the

25   subject has exited the room, we close the door, and we stop the

1    video.  He's taken from that room and put right back in the

2    holding cell.

3    Q.   Did you personally take him into the holding cell?

4    A.   I held the door open and Detective Castillo put him in.

5    Q.   And approximately what time was that?

6    A.   6:43.

7    Q.   When did you next see the defendant?

8    A.   Actually, when I was leaving for the day, I stuck my head

9    in there and just asked him, Tony, did you eat, because in the

10   video I told him I would get him something to eat.  I wanted to

11   make sure the detective fed him.

12   Q.   And what was the defendant doing when you saw him?

13   A.   Sitting on the bench eating.

14   Q.   What time was that approximately?

15   A.   I left at 1900, 7:00.

16   Q.   And after that, when was the next time that you saw the

17   defendant?

18   A.   I haven't until now.

19            MS. GEDDES:  No further questions at this time.

20            THE COURT:  Cross-examination.

21            MS. BAUMGARTEL:  Yes, your Honor.  I have one quick

22   question about an exhibit.  May I confer with the government

23   briefly?

24            THE COURT:  Sure.

25            MS. MIRON:  Your Honor, may we ask that the witness be

 1    excused briefly?  There's an issue regarding the 3500.  I

 2    believe the government will provide us with a little bit of

 3    additional information, but we don't want to discuss it in his

 4    presence.

 5              THE COURT:  Sure.  Understood.

 6              Sergeant LoPuzzo, would you be kind enough to step out

 7    of the courtroom for a few moments.

 8              (Witness not present)

 9              THE COURT:  Can Ms. Pyun just assist?

10              MS. BAUMGARTEL:  If that's OK with you, that's fine.

11              MS. MIRON:  Your Honor, I can go get the witness.

12              THE COURT:  Great.  Thank you so much, Ms. Miron.

13              (Witness present)

14              THE COURT:  You can have a seat, Sergeant.

15              And you may proceed, Ms. Baumgartel.

16              MS. BAUMGARTEL:  Thank you.

17    CROSS-EXAMINATION

18    BY MS. BAUMGARTEL:

19    Q.  Good afternoon, Sergeant.

20    A.  Good afternoon.

21    Q.  You testified that you are the commanding officer of the

22    40th Precinct detectives squad, is that right?

23    A.  Yes.

24    Q.  And it's fair to say that on April 1, you were pretty busy?

25    A.  Every day, yes.

1    Q.  I mean, you had stayed many hours past when your shift was

2    supposed to be over, correct?

3    A.  Yes.

4    Q.  It seems like you were working on a lot of different cases

5    that day, correct?

6    A.  I'm in charge of every case in that office, yes.

7    Q.  Is it fair to say that your memory of your interactions

8    with Mr. Pritchette may not be complete?

9    A.  I'm pretty certain in what I remember.

10   Q.  OK.  I'd like to direct your attention to Government

11   Exhibit 6, which is the audit report that you put together for

12   this case.  Do you still have that in front of you?

13   A.  Yes.

14   Q.  And sir, could you turn to page 8 of this exhibit.  Now,

15   you told us that the case number for Mr. Pritchette's case was

16   233, correct?

17   A.  That's correct.

18   Q.  And if you look at page 8 and you go a few lines up from

19   the bottom, at time 17:40:37, you access case 233, right?

20   A.  Yes, I did.

21   Q.  So you did in fact look at the file related to

22   Mr. Pritchette's case before you saw him, right?

23   A.  At 1740, yes.

24   Q.  So Mr. Pritchette came in through a patrol arrest, right?

25   A.  Patrol apprehension, yes.

1    Q.  And someone had called 911 and identified Mr. Pritchette as

2    the person who robbed the MetroPCS store, right?

3    A.  That's correct.

4    Q.  And that call came in around 5 p.m. that day, is that

5    accurate?

6    A.  I, I don't recall the exact time.  I think Detective

7    Castillo has that noted in his case.

8    Q.  I'm going to show you something that we'll mark just for

9    identification purposes as a defense exhibit, just to avoid

10   confusion, Defense Exhibit F, because we've submitted prior

11   exhibits.  Just because you said you don't recall, I'm going to

12   show this to you to see if it refreshes your recollection.

13            MS. BAUMGARTEL:  Your Honor, may I approach as well?

14            THE COURT:  You may.

15   Q.  Just take a moment to examine that document and to read it

16   to yourself.

17   A.  Yes.

18   Q.  And does that refresh your recollection as to approximately

19   what time the call came in regarding the MetroPCS robber?

20   A.  Yes.

21   Q.  And that was around 5:00, right?

22   A.  1703, which is three minutes after five, yes.

23   Q.  Thank you.  I'm just going to take that back.

24       And then you testified that Mr. Pritchette was actually

25   brought into the precinct sometime around 5:40 that day, is

1  that right?

2  A.  1750.

3  Q.  I'm sorry.  1750.

4  A.  Yes.

5  Q.  Now, when you accessed the file, according to your log, you

6  were looking at the wanted fliers, is that right?

7  A.  If, if I could look at the copy that's not redacted, I

8  could tell you exactly what I looked at.

9        MS. BAUMGARTEL:  Your Honor, I have from the

10  government a copy of that page that's not been redacted.

11  Q.  And so that entry indicates wanted fliers?

12  A.  Wanted flier witness.

13  Q.  So what did you access in connection with Mr. Pritchette's

14  case?

15  A.  I believe I looked to see -- we didn't have a name.  I

16  wasn't sure who they were bringing in.  There was that other

17  male in the video that our theory was might have set it up.  I

18  looked to see what that guy looked like, because I, I knew the

19  person responsible had green eyes and was named Tony, Tony

20  Green Eyes.  So I was, now that you say it, I looked to see

21  what that other guy looked like.

22  Q.  And you also printed documents, right?

23  A.  No.

24  Q.  It says print next to that entry, right?

25  A.  It says print next to every, every entry.

1    Q.  So you don't recall -- your testimony is you didn't print?

2    A.  Print, no.

3    Q.  But you had previously testified that you didn't look at

4    the file, right?

5    A.  I didn't recall.

6    Q.  Now as far as you know, did any other officer question

7    Mr. Pritchette while he was at the precinct other than yourself

8    and Detective Castillo?

9    A.  Not that I'm aware of.

10   Q.  And I think you testified that before what we see on the

11   video, when you and Detective Castillo bring Mr. Pritchette

12   into the interrogation room, Mr. Pritchette had never been in

13   that room, right?

14   A.  No.

15   Q.  Let me ask my question a better way.  Had he ever been in

16   that room?

17   A.  No.

18       MS. BAUMGARTEL:  Could we please bring up the video.

19   I would like to start at 3:24.  Just play a short clip.

20       (Video played)

21       MS. BAUMGARTEL:  That's right.  Can you stop it there,

22   please.

23   Q.  So now during this interrogation, before you start

24   questioning Mr. Pritchette, you ask him to take his hat off,

25   right?

 1    A.   Yes.

 2    Q.   And you can see in this video that he takes it off and he

 3    puts it on his knee, right?

 4    A.   Yes.

 5    Q.   Under the table, right?

 6    A.   Yes.

 7              MS. BAUMGARTEL:  Could we go back to the very start of

 8    the video, please, the very beginning.  And it's at 0:52.  I'd

 9    just like to watch this section of the video as

10    Mr. Pritchette --

11              (Video played)

12              MS. BAUMGARTEL:  Stop right there.  Perfect.

13    Q.   You see Mr. Pritchette entering the room here, right?

14    A.   Yes, I do.

15    Q.   He doesn't have a hat on, right?

16    A.   He has it in his hand because you'll actually see him drop

17    it.

18    Q.   Well, let's watch the video.

19              MS. BAUMGARTEL:  Can you go ahead and play it, please.

20              (Video played)

21    Q.   He bends down right there, right?

22    A.   Picks up his hat, correct.

23    Q.   He picks up his hat from under the table, right?

24    A.   Yes.

25    Q.   Because that was in that room already, wasn't it?

1    A.   No.

2              MS. BAUMGARTEL:  Can we start the video, please, and

3    watch it again.  So it's past 52.

4              (Video played)

5    A.   He dropped his hat.  If you go to the very beginning --

6    Q.   OK, let's go to the beginning.

7    A.   -- you'll actually hear him say, Can I bring my hat.

8              MS. BAUMGARTEL:  Let's go to the very beginning.

9              (Video played)

10             MS. BAUMGARTEL:  OK, you can stop the video there.

11   Q.   Now, you're familiar with the reports that the NYPD put out

12   to the media relating to this case, right?

13   A.   Yes.

14   Q.   And the NYPD had video related to the robbery, right?

15   A.   Correct.

16   Q.   And there is video from inside the MetroPCS for during the

17   robbery?

18   A.   Correct.

19   Q.   And then there's other video from a nearby bodega, right?

20   A.   Also correct.

21   Q.   And the police released still frames from this video to the

22   media before they had arrested someone, right?

23   A.   Correct.

24   Q.   Did the NYPD release to the press pictures of anybody other

25   than the perpetrator of the robbery, other than Mr. Pritchette?

1    A.  We did two fliers, one for Mr. Pritchette and one for that

2    unknown male, and we did a request for media attention where it

3    was actually put on the news.

4    Q.  When you did two -- what was the word you used?

5    A.  Wanted fliers.

6    Q.  And so you already had pictures of the other person, you

7    already had the still-frame images?

8    A.  Yes.

9    Q.  Right?

10   A.  Yes.

11   Q.  Now, I'd just like to turn your attention back to the audit

12   report that you printed.  The last entry on this report is at

13   17:57:19, correct?

14   A.  17:57:19, correct.

15   Q.  And that's about a half hour before the video recording of

16   Mr. Pritchette's statement starts, right?

17   A.  Yes.

18   Q.  And so you weren't spending any time on your computer

19   accessing files in the half hour before what's on this video

20   recording, right?

21   A.  Correct.

22   Q.  Isn't it true that during that time you were questioning

23   Mr. Pritchette?

24   A.  No.

25   Q.  Isn't it true that you and possibly with Detective Castillo

1    questioned him before you gave him Miranda warnings?

2    A.   No.

3    Q.   You mentioned on your direct testimony that you don't

4    record every interrogation of a robbery suspect, right?

5    A.   Robberies that are made by patrol personnel are enhanced,

6    which the detective takes the case, he'll try to get a

7    statement from the subject.  We don't do those on video.  Those

8    are oral or written statements.

9    Q.   Have you ever questioned a robbery suspect when you haven't

10   been video recording it?

11   A.   Yes.

12   Q.   And have you ever questioned a suspect before reading

13   Miranda rights?

14   A.   Not about the incident he's being charged with.

15   Q.   You've asked them questions?

16   A.   I've asked them, How are you, where do you live, general

17   questions, but nothing about the crime itself.

18   Q.   You haven't asked any questions to ascertain anything about

19   the crime before reading someone Miranda rights?

20   A.   No.

21   Q.   Does the 40th Precinct have a criminal intelligence

22   section?

23   A.   Criminal intelligence?  They have what's called FIO.

24   Q.   What does that stand for?

25   A.   They're responsible for doing a lot of debriefings and for

1    trying to get search warrants based on interviews that they

2    conduct.

3    Q.   FIO stands for field intelligence officer, right?

4    A.   Correct.

5    Q.   And the 40th Precinct has one of those?

6    A.   Every precinct does, yes.

7    Q.   And that person's job was to debrief suspects, right?

8    A.   Correct.

9    Q.   And so that person is often questioning suspects who come

10   in as well, right?

11   A.   That's also correct.

12   Q.   Did that person question Mr. Pritchette that night?

13   A.   I see from the command log entry that he did at 8 p.m. that

14   night.

15   Q.   So Mr. Pritchette was questioned by another officer, other

16   than you and Detective Castillo, right?

17   A.   After the fact, yes.

18   Q.   And do you know the substance of that interrogation?

19   A.   No.

20   Q.   Just turning back to your meeting with Mr. Pritchette,

21   isn't it true that before this video starts, you told

22   Mr. Pritchette that you had evidence that he had committed this

23   robbery?

24   A.   Myself personally, no.

25   Q.   Did you have the opportunity to observe every interaction

1    that other officers had with Mr. Pritchette while he was at the

2    precinct?

3    A.  No.

4    Q.  So is it possible that another officer said that to

5    Mr. Pritchette?

6    A.  Anything's possible, but not in my presence, not that I'm

7    aware of.

8    Q.  But you just said you didn't observe every interaction

9    between other officers and Mr. Pritchette, right?

10   A.  I wasn't there for the apprehension and the ride in to the

11   precinct, so I don't know about that.

12   Q.  And you didn't see him every moment that he was at the

13   precinct, right?

14   A.  That's correct.

15   Q.  So is it possible that someone could have shown

16   Mr. Pritchette pictures of the robbery suspects and asked him

17   questions?

18   A.  Not that I'm aware of.

19   Q.  But is it possible?

20   A.  Anything's possible.

21   Q.  Well, let's look a little bit more at the video.  You were

22   aware that Mr. Pritchette had a drug problem, right?

23   A.  Yes.

24        MS. GEDDES:  Objection, your Honor.  The government

25   believes that inquiries into the defendant's drug problem are

1    outside the scope of this hearing.

2            THE COURT:  Overruled.  This is an issue about the

3    voluntariness.

4            MS. BAUMGARTEL:  Actually, your Honor, this is just

5    going to relate to, I think, further evidence that there was a

6    pre-Miranda interrogation, but yes, it also would go to the

7    voluntariness.

8            THE COURT:  You can proceed.

9            MS. BAUMGARTEL:  Thank you, your Honor.

10           THE COURT:  I overruled the objection.

11   Q.  Let me just say it again.  You're aware Mr. Pritchette had

12   a drug problem, right?

13   A.  In my opinion, he was a drug addict, yes.

14   Q.  And you're aware of that based on his appearance, right?

15   A.  I'm sorry?

16   Q.  You were aware of that based on his appearance, how he

17   appeared when you saw him?

18   A.  Yes.  His general demeanor, face was drawn in, very thin.

19   Q.  Can you say more about why or what was the basis for your

20   opinion?

21   A.  Like I said, I've been doing this for 33 years, I could

22   usually look at somebody and say, OK, this guy has a problem.

23   But when he was being brought out of the cell, he told

24   Detective Castillo, "I need help."  I took that to mean he

25   needed help because of his addiction.

1    Q.  And Mr. Pritchette told you that he had a drug problem

2    also, right?

3    A.  During the interview he did, yes.

4    Q.  And he also told you that at the time of the robbery he was

5    living on the streets?

6    A.  He said he was homeless, yes.

7         MS. BAUMGARTEL:  Now, so can we look at the video at

8    2:15.

9         (Video played)

10         MS. BAUMGARTEL:  You can stop it there.

11   Q.  Now, you said "obviously" to Mr. Pritchette.  This was the

12   first conversation, according to your testimony, that you had

13   with him, right?

14   A.  That's correct.

15   Q.  But you said "obviously," as if he would know what you were

16   going to ask about?

17   A.  Well, when you're brought into the precinct and put in the

18   cell, you're being brought there for a purpose.

19   Q.  Well, he was brought in because he had a parole warrant,

20   right?

21   A.  We, we didn't know.  We didn't know he had a parole

22   warrant.  For them to say that he had a parole warrant, they

23   had to either run him on a tablet or do some kind of check out

24   in the field.

25   Q.  So are you saying at the time that you were questioning

1    Mr. Pritchette, you didn't know he had a parole warrant?

2    A.  I wasn't aware.  Like I said, he wasn't identified at this

3    point.  This is the first time I'm ever seeing him.

4    Q.  Well, he was identified by the officers who arrested him,

5    right?

6    A.  Based on a 911 call saying I see the guy in the video or

7    the guy I saw on TV walking down the street, they apprehended

8    him.

9    Q.  When they apprehended him, to your knowledge, did they ask

10   him for identification?

11   A.  I'm sure they did, but I can't say.  I wasn't there.

12   Q.  And would it have been standard after they asked for

13   identification for them to then run a warrant check?

14   A.  Yes, based on the smartphones they have, and each car has a

15   tablet now, they could run him right out in the field.

16   Q.  And if he did have a parole warrant, that would have come

17   up during that warrant check, right?

18   A.  That would have been reason enough for them to bring him

19   in.  If we proceeded with this and we did a lineup and he

20   wasn't ID'd, he would only have been arrested on a warrant.

21   Q.  In fact, at the very beginning of this interrogation,

22   Mr. Pritchette says he knows he has a warrant, right?

23   A.  He didn't say it to me.  He may have said it to somebody

24   else.

25            MS. BAUMGARTEL:  Can we go to the beginning of this,

1    starting at 52 again.

2    Q.  Actually, you reviewed this video recently, right?

3    A.  Friday.

4    Q.  And did you watch the entire video?

5    A.  Yes.

6            MS. BAUMGARTEL:  OK.  So go ahead.

7            (Video played)

8            MS. BAUMGARTEL:  Can you stop right there.

9    Q.  So, to your understanding, what was that statement in

10   reference to, "Now I'm going to jail," if you know?

11   A.  I believe the --

12           MS. GEDDES:  Objection, your Honor.  It calls for

13   speculation into what the defendant was thinking.

14           THE COURT:  Sustained.

15   Q.  Let's talk about another part of the video.

16           MS. BAUMGARTEL:  So at 10:39.

17           (Video played)

18           MS. BAUMGARTEL:  You can stop it there.

19   Q.  You say, "Like I said," but in the prior ten minutes of

20   this video you had never said that no one got hurt during the

21   robbery, right?

22   A.  Not in the video, no.

23   Q.  So had you had an earlier conversation with Mr. Pritchette

24   where you said to him no one got hurt?

25   A.  No.

1    Q.  Now, at another point during this video, Mr. Pritchette

2    tells you that he knows he didn't put any fingerprints on the

3    gun, right?

4    A.  Yes.

5    Q.  And you had not previously mentioned fingerprints during

6    the course of this video, right?

7    A.  Not at all.

8    Q.  OK.  Isn't it true that in your first interrogation of

9    Mr. Pritchette, you told him that the police had found

10   fingerprints on the gun?

11   A.  No, because there was no first interview.

12   Q.  So he just raises fingerprints on his own?

13   A.  Apparently he did.

14   Q.  Now, you also talked about how you asked Mr. Pritchette

15   about another individual who you suspect might have been

16   involved in the robbery, right?

17   A.  That's correct.

18   Q.  And in discussing this with him, you say "the person we see

19   on the video," right?

20   A.  Yes.

21   Q.  And you gave an explanation in court to explain to everyone

22   here who hasn't seen the video who that person is?

23   A.  Yes.

24   Q.  And that explanation was necessary because otherwise we

25   wouldn't have known, right?

1    A.   Also correct.

2    Q.   And that's because it was you and Detective Castillo,

3    according to your testimony, who had watched the video, right?

4    A.   Yes.

5    Q.   But it was your expectation that Mr. Pritchette would know

6    even though you hadn't shown him the video?

7    A.   Yes.  Because if you watch further, I asked, Have you seen

8    yourself on TV, and he said other people had told him about it.

9    Q.   But you didn't release a video of the offense to the

10   reporters, did you?

11   A.   The -- what we do is we send the whole clip and they put

12   what they want on the news.

13   Q.   A clip of the robbery?

14   A.   Yes.

15   Q.   That would not have shown this other person that you're

16   referencing, right?

17   A.   Unless we also sent that flier saying we want to speak to

18   this individual, we want to identify this other individual seen

19   out front.

20   Q.   Right, but in this question to Mr. Pritchette, you're

21   talking about a video, right?

22   A.   That's correct.

23   Q.   And there would not have been any video released to the

24   media showing a person other than Mr. Pritchette, right?

25   A.   It depends.  If we're trying to identify someone even as a

 1    witness, a lot of times we'll ask for the media's help.

 2    Q.  In this case, did you release a video of anyone other than

 3    Mr. Pritchette to the media?

 4    A.  I don't believe so.  I think just him for that.

 5    Q.  And the video is from a bodega that's nearby the robbery,

 6    right?

 7    A.  There was two videos recovered, one from the location

 8    itself and one from the store next door, yes.

 9    Q.  And so the video that shows this other person is not a

10    video of the robbery, right?

11    A.  It's just prior to, correct.

12    Q.  But you suspect this other person might be involved, right?

13    A.  Speculation, yes.

14    Q.  So you ask Mr. Pritchette questions about him?

15    A.  Yes.

16    Q.  And the way Mr. Pritchette knew who you were asking about

17    is because you showed him pictures in the earlier

18    interrogation, right?

19    A.  Absolutely not.

20    Q.  Now, let's just come back briefly to Mr. Pritchette's drug

21    use.  During the time of this interview, you said that you

22    suspected that he was a drug user, right?

23    A.  Yes.

24    Q.  And that he told you that he had been using something like

25    11 or 12 bags of heroin a day?

1    A.  During the video he told me that, yes.

2    Q.  That's a lot of heroin, right?

3    A.  Yes, it is.

4    Q.  And you thought that that would probably have a strong

5    impact on him, right?

6    A.  I thought that would be the motivation for the robbery,

7    yes.

8    Q.  And it would affect his state of mind, right?

9    A.  Ordinarily.  It affects different people different ways.

10   Q.  And Mr. Pritchette at this time, he was definitely sedate,

11   right?  Would you characterize Mr. Pritchette during your

12   interview as alert?

13   A.  He, he was responsive to all my questions.  He wasn't

14   nodding.  He actually corrected me on a couple of points.  I

15   thought he was fine.

16   Q.  He's slumped over in his chair, right?

17   A.  So am I, but that's just posture.

18   Q.  And your head is up, his head is crooked and down, right?

19   A.  Yeah, but if you watch, when he answers me he looks up at

20   me.

21   Q.  And sometimes he answers and sometimes he sort of half nods

22   and sometimes he sort of mumbles, right?

23   A.  I have no trouble understanding him.  It appeared he had no

24   trouble understanding the questions I asked him.

25   Q.  And you continued questioning him even after you heard that

1    he'd been using about 11 to 12 bags of heroin a day, right?

2    A.   Yes.

3          MS. BAUMGARTEL:  Just one moment, please, your Honor.

4    Q.   Just a few more clarifying questions.  In the command log

5    that was entered into evidence, are there any other entries

6    related to Mr. Pritchette?

7    A.   Only the one that you see in the margin, which would say

8    what time he exited the precinct for lodging.

9    Q.   And what time does that indicate that he exited, and where

10   did he go?

11   A.   At 2100, which is 9 p.m. in the evening, and he gets taken

12   to central booking for lodging.

13   Q.   And then just to clarify in terms of what was released to

14   the media, as far as you're aware with this case, there were

15   photographs of Mr. Pritchette released, right?

16   A.   There, there's two wanted fliers, one of the subject who is

17   Mr. Pritchette, and one is unidentified male that we wanted to

18   speak to.  Those fliers also get released to the media and get

19   sent out citywide.  The actual video that was put on TV, I

20   never watched it, so I don't know what portion they used.

21   Q.   But as far as you know, they didn't release a video of the

22   other person?

23   A.   As far as I know, yes.

24   Q.   And do you have a copy of the wanted fliers related to this

25   other person?

1    A.   They're in the case folder.

2    Q.   OK.  Have you provided those to the government?

3    A.   I gave them everything that was in the case folder.

4            MS. BAUMGARTEL:  Your Honor, I have no further

5    questions.

6            THE COURT:  All right.  Redirect.

7            MS. GEDDES:  Yes, just briefly, your Honor.

8    REDIRECT EXAMINATION

9    BY MS. GEDDES:

10   Q.   Sergeant LoPuzzo, on cross-examination, you were asked

11   about accessing files in the 30 minutes before the interview.

12   Do you recall that question in your testimony?

13   A.   Yes.

14   Q.   And if you had accessed files in those 30 minutes but

15   didn't make any edits or sign off on them, would those be

16   reflected on that log we have as Exhibit 6?

17   A.   No.

18   Q.   And would that log reflect when you had closed files that

19   were already open?

20   A.   Yes.

21   Q.   So Exhibit 6 shows when a file is closed or just when it's

22   open?

23   A.   That shows me signing off and that, that will take that

24   DD-5 off the screen.

25   Q.   OK.  But would that be reflected in Exhibit 6, the time

1    that you closed the file?

2    A.  Yes.

3    Q.  If you could turn to it, do you have Exhibit 6 in front of

4    you?

5    A.  Yes.

6    Q.  And where does it show when a file is closed?

7    A.  I'm sorry.  What page?

8    Q.  Any page.  Access time, you said, indicates the time that

9    you opened up one of these files, correct?

10   A.  I'm just going to go to the first page, 6:59:21.  That was

11   the time I signed off on that one.  Then the next one is

12   6:59:24.

13   Q.  And just to be clear, the 6:59:21, is that the time you

14   opened the file or closed the file?

15   A.  That's the time that I signed it and closed it.

16   Q.  And if you didn't find a file, then there wouldn't be a

17   time stamp indicating that you'd closed a file?

18   A.  Exactly.

19   Q.  And just to be clear, under the last column, access

20   function, where it says print, does that indicate that you

21   actually printed those files?

22   A.  No, but, but that's a function where, instead of reading

23   each 5 individually and going to the next one, to the next one,

24   I could print the whole case and read each 5 like a book.

25   Q.  Sergeant, on April 1, were you aware that the defendant was

1   a heroin user?

2   A.  It was confirmed after the interview, but I, I had my

3   suspicions, yes.

4   Q.  And what were your suspicions based on?

5   A.  Just years of experience.  His face was drawn.  His overall

6   demeanor.  He appeared to be someone that was a substance

7   abuser.

8   Q.  Did the defendant tell you that he had used any heroin that

9   day?

10  A.  No, he did not.

11  Q.  In the course of your career as a sergeant, have you

12  interacted with suspects who were intoxicated or high?

13  A.  Many times, yes.

14  Q.  And what are some of the substances that they were high or

15  intoxicated with?

16  A.  Everything from marijuana to heroin, alcohol.

17  Q.  Can you describe some of the characteristics of people who

18  were high on heroin?

19  A.  Usually inattentive, nodding off.  You have to bang the

20  table to get their attention.

21  Q.  Have you interviewed suspects who were high on heroin?

22  A.  Yes.

23  Q.  Are there circumstances under which you will not interview

24  someone because they were high on heroin?

25  A.  Yes.

1    Q.  Can you explain what those circumstances are?

2    A.  Heroin, even people that have had too much to drink, it's

3    futile to try to have a conversation with them.  I would rather

4    just stop the interview and either -- if they're drunk, let

5    them sober up, but if they're high and we're not getting

6    anywhere, we just won't even bother.

7    Q.  Have you ever come to believe during the middle of an

8    interview that someone was incapable of being interviewed for

9    some reason?

10   A.  Yes, for several reasons.

11   Q.  And in those circumstances what do you do?

12   A.  I usually just stop the interview, step outside, and I'll

13   tell the detective, Listen, this guy is, he's not mentally

14   capable, or he's too, too drunk or too high, he doesn't

15   understand; you have to keep getting his attention to ask him a

16   question.  It's just not worth the effort.

17   Q.  Can you please describe the defendant's demeanor when you

18   interviewed him on April 1, 2016?

19   A.  I thought he was fine.  He answered my questions.  He

20   looked at me.  He corrected me a couple of times when I said

21   something that was wrong.  I asked him what he wanted to eat

22   and he told me exactly what he wanted.  He even said, "a little

23   mayo."  Someone that's nodding or not paying attention, I

24   didn't find anything wrong with him.

25   Q.  Can you describe the defendant's physical condition at the

 1  time of the interview on April 1?

 2  A.  He wasn't staggering.  He sat down fine.  He didn't need

 3  any help being walked from one room to the other.  I didn't see

 4  anything wrong with him physically.

 5  Q.  You mentioned some people you've interviewed on heroin were

 6  nodding off.  Did the defendant do that at all during the

 7  interview?

 8  A.  No, no.

 9  Q.  Did you have to bang on the table to get the defendant's

10  attention during the interview?

11  A.  No, not at all.

12  Q.  During the course of your interview, what was your

13  understanding as to whether the defendant understood the

14  questions you were asking?

15  A.  He, he was answering me directly, and like I said, there

16  was one or two times he told me things that I wasn't even aware

17  of.  So I thought he understood me perfectly.

18  Q.  Did he ever indicate that he didn't understand the

19  question?

20  A.  No, I don't believe so.  No.

21  Q.  At any point during the interview, did he become

22  nonresponsive?

23  A.  No.

24  Q.  During the interview, what level of detail did the

25  defendant provide in response to your questions?

1    A.  He said something about the, the amount of money that was

2    taken, which was different from what I read on the original

3    complaint report.  He knew the exact number of phones that were

4    taken, which was also different from the complaint report.  So

5    he knew a few things.  He knew that the gun was in a plastic

6    bag, and he remembered that he had found the gun in a Dumpster

7    or an abandoned building.  He knew things that showed he knew

8    what I was asking and what he was responding.

9    Q.  Did you observe him sleeping at any point during the

10   interview?

11   A.  No, not at all.

12   Q.  And did you observe him sleeping after the interview?

13   A.  No.  Like I said, when I was leaving he was sitting up in

14   the cell eating a sandwich.

15           MS. GEDDES:  Just one moment, your Honor.

16   Q.  Sergeant, when you were discussing on cross-examination the

17   defendant's hat, you indicated that you recalled him asking if

18   he could take it into the interview room.  Do you recall that

19   question?

20   A.  Yes.

21   Q.  That discussion?

22   A.  Yes.

23   Q.  Is that something he said inside the interview room or

24   outside before he went in?

25   A.  As we were actually walking in, he said something to the

1    effect, Can I take my hat, and I told him, Yeah, you can bring

2    it.

3                MS. GEDDES:  No further questions.

4                THE COURT:  Recross.

5                MS. BAUMGARTEL:  Just briefly.  We'd like to ask for

6    another unredacted item from the government, and then I have

7    very briefly a few questions to follow up.

8                THE COURT:  That's fine.

9    RECROSS-EXAMINATION

10   BY MS. BAUMGARTEL:

11   Q.  Hello again, Sergeant.  In the criminal complaint that you

12   looked at, what was the amount of money reportedly taken from

13   the MetroPCS store?

14   A.  Some extraordinary amount, 4,000 something.

15   Q.  OK.  And what other property was reported taken?

16   A.  Cell phones.

17   Q.  Do you recall how many they reported were taken?  Pardon

18   me.  Let me rephrase that.

19       Do you recall how many the complaint specified had been

20   taken?

21   A.  Not off the top of my head, but it was quite a few, I

22   believe.

23   Q.  It was more than Mr. Pritchette said he took, right?

24   A.  Oh, yes.  Yes.

25   Q.  And the information about what was taken from the MetroPCS

1    store, was that released to the press?

2    A.  I'm not sure how they worded it.  Usually, if I may, when

3    you send a request for media, it goes to the chief of

4    detectives office.  A detective there walks it over to DCPI.

5    Before they give the approval to put it on the news, they'll

6    call the detective and they'll say, We need a few more facts,

7    how much was taken, was anyone injured, just certain things

8    that may not have been on there, and then they arrange that.

9    So it's possible they said it was a robbery with the

10   extraordinary amount of money.

11   Q.  To your knowledge, did the press release in this case

12   include the number of phones and the amount of money taken?

13   A.  I don't know, because I never saw it myself.

14            MS. BAUMGARTEL:  No further questions.  Thank you.

15            THE COURT:  Anything further?

16            MS. GEDDES:  No, your Honor.

17            THE COURT:  Sergeant, I just have a couple of

18   questions about Government Exhibit 6, and if you'd just go to

19   the first page, which was the one that you were using to

20   describe what these entries mean.

21            THE WITNESS:  Yes.

22            THE COURT:  Now, if I understood you correctly, you're

23   telling me that at 06:59:21, you signed off, I take it, on a

24   DD-5.

25            THE WITNESS:  Yes.

1          THE COURT:  Where you clicked?

2          THE WITNESS:  That's correct, your Honor.

3          THE COURT:  You signed off on it --

4          THE WITNESS:  Yes.

5          THE COURT:  -- electronically?

6          And does the next one immediately open up for you?

7          THE WITNESS:  No.

8          THE COURT:  So looking at the next entry, three

9    seconds later, 06:59:24, what does that entry connote?  Are you

10   opening a file, opening a DD-5 at that point?

11         THE WITNESS:  Yes.  If I'm signing these in the

12   morning like that, these are work that the detectives on the

13   4-to-12 have done.  And if you'll look, one, two, three, those

14   first six say 1175.

15         THE COURT:  Yes.

16         THE WITNESS:  So when I go to the sign-off screen, it

17   will have, for example, Detective Caruso, number of DD-5s 12;

18   number not reviewed six.  So I'll click on that sign-off sheet,

19   and it may be nothing, saying "I attempted to go the

20   complainant, no answer," I'll sign that.  Go to the next one,

21   "I went to the door, knocked on it, no answer."  I'll go to the

22   next one.  So it's just those particular files pertaining to

23   that particular case.

24         THE COURT:  OK.  So these are like two- to

25   three-second reviews.

1            THE WITNESS:  Yes.

2            THE COURT:  OK.

3            THE WITNESS:  Yes.  If it's a long, complicated

4     interview, it will take me a while to read it.

5            THE COURT:  All right.  So each line entry represents

6     a sign-off on a DD-5.

7            THE WITNESS:  That, that's correct.

8            THE COURT:  OK.  All right.  Thank you.

9            Anything further?

10           MS. GEDDES:  No, your Honor.

11           MS. BAUMGARTEL:  Very briefly.

12    RECROSS-EXAMINATION

13    BY MS. BAUMGARTEL:

14    Q.  Are there other access functions other than print?

15    A.  I'm sorry?

16    Q.  Just with reference To Government Exhibit 6, are there

17    other access functions other than print?  Is there something

18    else that could appear in that column?

19    A.  No.  No.

20    Q.  OK.  So no matter what you do with a record, it comes up as

21    print?

22    A.  Yes.

23           MS. BAUMGARTEL:  Thank you.

24           THE COURT:  And essentially print doesn't mean print;

25    it means that you just signed off on it, right?

1          THE WITNESS:  Actually --

2          THE COURT:  What does it mean?

3          THE WITNESS:  A lot of squad commanders will do this.

4    Rather than going --

5          THE COURT:  Speak into the mike.

6          THE WITNESS:  Sorry.

7          A lot of squad commanders will do this.  Instead of

8    going into each additional 5, they'll put print case.  Now all

9    the files will come up, not just the headings, the actual 5s

10   themselves, so you could read through and say I left a note for

11   this guy to do this, let me just make sure he did that.  So

12   it's basically a continuous row of DD-5s that you could just

13   read to go back and remember what you did.  So a lot of the

14   guys will print the case, read it, then go back and sign the

15   5s.

16         THE COURT:  All right.  I think I got that.

17         Any further questions?

18         MS. GEDDES:  No, your Honor.

19         MS. BAUMGARTEL:  No.

20         THE COURT:  All right.  Thank you very much, Sergeant.

21   You're excused.

22         (Witness excused)

23         THE COURT:  Does the government have any other

24   witnesses to call or evidence to offer?

25         MS. GEDDES:  No, your Honor.

1          THE COURT:  Does the government rest?

2          MS. GEDDES:  Yes, your Honor.

3          THE COURT:  Does the defense have any witnesses to

4     call or evidence to offer?

5          MS. BAUMGARTEL:  Your Honor, with respect to the first

6     part of our motion, we're not calling any additional witnesses.

7     There was a dispute between the parties about the question of

8     Mr. Pritchette's May statement to a federal officer and to

9     another NYPD officer.  To the extent that the government is

10    arguing that the statements made by that NYPD officer were true

11    as a basis for denying suppression, we would like to call that

12    officer and potentially someone from the U.S. Attorney's

13    Office.  I understand that officer is not available today.  To

14    the extent that the government is agreeing or the Court is

15    finding that those statements are not true and then deciding

16    the case from there, it would not be necessary for us to call a

17    witness.

18         MS. GEDDES:  Your Honor, there's no need for a witness

19    as to the May statements regardless of whether the statements

20    are true.  The Court can assess whether a statement is plainly

21    false.  In one case cited in our brief, United States v. Chan,

22    the court found without a hearing that the plain thrust of the

23    statements the agent made to the defendant was true and that

24    they were not plainly false as the statements were in the case

25    cited by the defendants, which is Anderson.

1    Furthermore, the subjective intent of the agent is

2    irrelevant.  So whether or not the agent believed that what he

3    was saying was true, whether he thought it was true and he was

4    mistaken, or whether he believed the things he was saying

5    weren't true is irrelevant.  Those cases are also cited in our

6    brief.

7    In Moran v. Burbine, the Supreme Court says that

8    "whether intentional or inadvertent, the state of mind of the

9    police is irrelevant to the question of the intelligence and

10   voluntariness of respondent's election to abandon his rights,"

11   so the government believes that there is simply no need for a

12   hearing.  The video-recorded statements are what they are.  The

13   parties can argue about whether they're plainly false, whether

14   they rise to the level of Anderson, but there's no need for a

15   hearing with a witness to testify as to any of that.

16   MS. BAUMGARTEL:  Your Honor, just briefly, we think

17   that the statements are plainly false.  It's the government's

18   burden, of course, both to show that Miranda is knowingly and

19   intelligently waived and that the statements are voluntary, so

20   to the extent that the government is depending on the truth of

21   those statements, it's the government's burden to prove them

22   true.

23   Our position is that they're false and that the Court

24   can, in fact, conclude that they're false based on the records

25   that we have.  However, the government's brief suggested

1  through unsworn statements that what was said was actually true

2  and it was consistent somehow with the policy of the Southern

3  District U.S. Attorney's Office to require a good faith show by

4  a defendant that this is something that the U.S. Attorney would

5  be inquiring about in court that day.  If the government is

6  prepared to say that those statements are not true, then I

7  agree we don't need a hearing.  If the government says that

8  those statements are true, then I think we would need to call a

9  witness to inquire about that.

10  MS. GEDDES:  Your Honor, as I said, the truth or

11  falsity of the statements is irrelevant.  The subjective intent

12  of the agent is irrelevant.  We offered in our brief examples

13  of why those statements aren't plainly false.  Just as the

14  defendant gave examples of why they felt they were false, we

15  gave examples of why they weren't false.  We weren't acting as

16  a witness; we're just presenting common-sense examples of how a

17  statement wasn't plainly false.  There is no need for an

18  assistant U.S. attorney to testify as to those.  The Court can

19  hear the statements as it can see them in the video and decide

20  based on that whether the defendant was coerced into making the

21  statements.  The Court does not need to decide whether the

22  statements were actually true or false.

23  THE COURT:  Does it matter whether the statements were

24  true or false?  I mean, I've read your briefs.  There is

25  posturing on both sides, essentially, but does it matter?

1          MS. BAUMGARTEL:  Your Honor, I think under <u>Anderson</u> it

2     does matter.  I think the court emphasized that what rendered

3     that an improper inducement was essentially that it was

4     misleading legal advice, and in cases where courts have found

5     that there was no Fifth Amendment violation, they have tended

6     to say nothing that the agent said was inaccurate because the

7     agent was truthfully sharing the potential benefits of

8     cooperation, and things along those lines, and so I do think

9     it's a factor the court can consider that the statements were

10    false.  It was relied upon by the court in <u>Anderson</u>, so we

11    would not agree that it is irrelevant.

12          MS. GEDDES:  Your Honor, in <u>Anderson</u>, the court

13    emphasizes that three times the defendant was told that he had

14    to speak to the agents then without attorneys, or he would

15    never be able to cooperate.  In that limited circumstance, the

16    court found that that was legal advice that was so false as to

17    make his statements coerced.  That hasn't been followed by many

18    other cases that are much closer to the case before us.  <u>U.S.</u>

19    <u>v. Chan</u>, a Southern District case, found the following

20    statement permissible, "that if the defendant wanted to help

21    himself he had to talk at that time and tell the agent what

22    happened; it would be too late for defendant to help himself by

23    talking later, because later the agents wouldn't talk to him."

24    That statement was permissible, and the distinction that the

25    courts draw is whether the defendant is basically told that he

has to now or never speak to the agents without a lawyer

present.

That's just not the situation we have here, as your

Honor can tell from the statements that appear in the video.

So does it matter if it's true or false?  If it's on the

extreme end of <u>Anderson</u>, maybe, but nothing else does, the

subjective intent doesn't matter.  And then even if it were

false, you look to whether there's actual government coercion,

and there's no coercion here.  For all these reasons, there's

no need for a witness.  We can argue this in our briefs, as we

have, but there's no need for a hearing on the accuracy of what

the agent told the defendant during the May hearing.

THE COURT:  All right.  I'm going to reserve on that

question now.  If I come to the conclusion that the defendant's

argument is correct here, we'll reopen the hearing and have the

agent testify.

Anything else?

MS. GEDDES:  Your Honor, I believe the defense

mentioned in their briefs, and we would also join in that

request, posthearing briefing.

THE COURT:  Yes.  When would you like to submit

something?  Obviously you need the transcript.

MS. GEDDES:  Would your Honor want simultaneous briefs

from the parties?

THE COURT:  I tend to think that that's probably best,

1    and then if there's something that's so infuriating that the

2    other side says, you can give a very short rebuttal brief.

3              MS. GEDDES:  Just one moment, your Honor.

4              Your Honor, could the parties have two weeks from

5    today, which brings us to, I believe, October 4?

6              THE COURT:  That's fine.  And then October 11 if

7    there's something, but don't feel compelled to offer anything,

8    further.

9              Now, where are we in this case with respect to the

10   speedy trial clock?

11             MS. GEDDES:  Your Honor, time was excluded through

12   today.  I don't have the sheet with me, but I believe we've

13   only lost a few days, if any.

14             THE COURT:  All right.  I'll set this matter down for

15   a further conference, and hopefully I'll have a decision on

16   this motion in the interim.  I'll set it down for Friday,

17   November 4 at 2:00.

18             What's the defendant's view regarding the exclusion of

19   time between now and November 4?

20             MS. BAUMGARTEL:  Your Honor, we have no objection.  I

21   expect the motion is still pending, which would result in the

22   exclusion of time.

23             THE COURT:  All right.  Since this continuance is due

24   to the pendency of a motion to suppress and the need for the

25   Court to receive additional briefing on the matter, I exclude

G9kWpriH

1  the time from today until November 4, 2016, from Speedy Trial

2  Act calculations.  I find that this continuance serves to

3  ensure the continued effective assistance of counsel and

4  prevents any miscarriage of justice.  Additionally, I find that

5  the ends of justice served by such a continuance outweigh the

6  best interests of the public and the defendant, Mr. Pritchette,

7  in a speedy trial, pursuant to 18 U.S.C. Section 3161.

8          Anything further?

9          MS. GEDDES:  Not from the government.

10          MS. BAUMGARTEL:  No.  Thank you.

11          THE COURT:  Very well.  Thank you.  Have a good

12  afternoon.

13          MS. GEDDES:  Thank you, your Honor.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2    Examination of:                              Page

3    Direct By Ms. Geddes . . . . . . . . . . . . . . 2

4    Cross By Ms. Baumgartel  . . . . . . . . . . .29

5    Redirect By Ms. Geddes . . . . . . . . . . . .49

6    Recross By Ms. Baumgartel  . . . . . . . . . .55

7    Recross By Ms. Baumgartel  . . . . . . . . . .58

8              GOVERNMENT EXHIBITS

9    Exhibit No.                              Received

10     4   . . . . . . . . . . . . . . . . . . . . . 7

11     3   . . . . . . . . . . . . . . . . . . . . . 9

12     5   . . . . . . . . . . . . . . . . . . . . .13

13     6   . . . . . . . . . . . . . . . . . . . . .17

14     1   . . . . . . . . . . . . . . . . . . . . .26

15

16

17

18

19

20

21

22

23

24

25